THE PENSACOLA AND ATLANTIC RAILROAD COMPANY, APPELLANT, VS. THE STATE OF FLORIDA, APPELLEE.

1. The enforcement of a tariff of freight and passenger rates which will not pay the expenses of operating a railroad, held, upon the pleadings, to show an abuse of the discretion given to Railroad Commissioners by the statute authorizing them to prescribe reasonable and just rates of freight and passenger transportation, and to amount to a taking of the railroad company's property without just compensation.

2. The effect of the provision of the Railroad Commission statute that the schedules of rates fixed by the Commissioners shall, in any action brought in the courts of this State against a railroad company, be deemed and taken as sufficient evidence that the rates fixed therein are just and reasonable rates for the transportation of passengers and freights and cars, is not to make such schedules conclusive as against judicial inquiry, but is to provide a new mode of proving the reasonableness and just character of the rates fixed by the Commissioners, and make the schedules competent and adequate evidence of the correctness of the action of the Commissioners in the absence of countervailing proof that they have exceeded their powers, or abused their discretion and invaded some right of the railroad company.

3. Where a tariff of freight and passenger rates has been established by the Railroad Commissioners, and the railroad company and the Commissioners differ as to whether such rates, considered as a whole, will prove remunerative to the company and there is room for a difference of intelligent opinion on the question, the

courts cannot interfere or substitute their judgment for that of the Commissioners, but the tariffs as fixed by the Commissioners must, in so far as the courts are concerned, be left to the test of experiment.

4. The courts have no power to make freight or passenger tariffs.

5. The courts will not interfere or grant any relief to a railroad company upon a complaint made as to one or several rates only, or where the freight and passenger rates established by the Commissioners are not assailed as an entirety.

Appeal from the Circuit Court for Gadsden county.

The facts of the case are stated in the opinion of the court.

*W. A. Blount,* for Appellant.

*The Attorney-General* for the State.

RANEY, C. J.: There are before us, on appeal from judgments of the Circuit Court, several actions instituted by the State against the appellant to recover penalties under the statute approved June 7th, 1887, and commonly known as the Railroad Commission Act. The cases from Gadsden county, in the Second Circuit, were brought last July, and the penalty adjudged in each of them is $2,500; that from Jackson county was commenced last April, and the penalty denounced in it is $2,000. Upon the conclusion of the argument made before us at the present term, we announced that the decision of these cases would, in view of the public interests involved, be disposed of at an early day.

The pleadings are similar in substance. The declaration in one of the Gadsden county cases, which we take as a type of all, alleges that the railroad company is a body corporate organized under a special statute of this State, approved March 4th, 1881, (chapter 3334), and operating a railroad from Pensacola to River Junction, both of which

points are in the State, and that on a certain day in April of the year 1888, it did " wilfully charge, collect and demand and receive " of a person, naming him, for transporting him as a passenger from River Junction to Marianna, another point on the road, a distance of twenty-six miles, the sum of $1.25, and that this sum was more than three cents per mile, the rate prescribed by the Railroad Commissioners, and that the sum so collected was more than a fair and reasonable rate of toll or compensation for the transportation of the passenger, and that eighty cents, the sum which the company was allowed by the above rate prescribed by the Commissioners (and a special rule as to amounts ending in other figure than 5 or 0) to charge, collect and receive, was a just and reasonable rate of compensation ; and that by thus wilfully collecting and receiving the stated excess over and above what it was allowed by the Commissioners' rules to charge, collect and receive, the railroad company became and was guilty of extortion, and of a violation of the rules and regulations prescribed and published by the Commissioners, by which rules and regulations the Commissioners made, among others, a schedule or tariff of just and reasonable rates for the transportation of passengers on appellant's railroad.

It is also alleged that the Commissioners gave notice to the principal officer of the railroad company of this violation, and directed the company to make reparation to the passenger for the injury and wrong so done him, by refunding to him the excess of forty-five cents, within thirty days, as prescribed by the statute, but it failed and refused to do so, and thereby forfeited to the State and incurred a penalty of five thousand dollars.

To this declaration the railroad company interposed four pleas, and the State demurred to them as insufficient in law. The demurrer having been overruled, and the com-

JANUARY TERM, 1889.          313

P. & A. R. R. Co. vs. State of Florida—Opinion of Court.

pany not electing to plead over, judgment was entered, the Circuit Judge fixing the penalty at the amount indicated above.

Section 13 of Article XVI of the Constitution of this State is as follows: The Legislature is invested with full power to pass laws for the correction of abuses, and to prevent unjust discrimination and excessive charges by persons and corporations engaged as common carriers in transporting persons and property, or performing other services of a public nature, and shall provide for enforcing such laws by adequate penalties or forfeitures.

Whether or not there is in this section a grant of any power which the Legislature did not have before, it is unnecessary for us to decide. There is, however, upon the face of it an apparent purpose to correct abuses. It shows that the Convention in adopting and the people in ratifying the section were impressed with a belief that there existed a necessity for the enactment of laws correcting abuses, preventing unjust discriminations and excessive charges by common carriers in transporting persons and property, and that confidence in the sufficiency of the common law remedies as agencies by which the individual citizen could find protection against or relief as to these evils had failed. As to the necessity for the command thus made by the people to the law-making power, the judicial department is concluded by the existence of the section.

To effect the end proposed by the Constitution, the first Legislature assembled under it, enacted the Railroad Commission Law, which was approved June 7th, 1887, it being Chapter 3746 of our statutes. This statute provides for the appointment of three Commissioners and (section 5) that they shall " make and fix reasonable and just rates of freight and passenger tariffs, to be observed by all railroad companies doing business in this State on the railroads

thereof," and just and reasonable regulations as to charges for the necessary handling and delivery of freights at any and all points, and for preventing discrimination in the transportation of freight and passengers, and reasonable and just rates of charges for the use of railroad cars carrying freight and passengers on said railroads, no matter by whom owned or carried ; and just and reasonable rules and regulations to be observed by said railroad companies on said railroads, to prevent the giving of any rebate or bonus directly or indirectly, and from misleading or deceiving the public in any manner as to the real rates charged for freight and passengers. It also confers power upon the Commissioners to designate and fix by rules and regulations the difference in the rates of freight and passenger transportation for longer or shorter hauls, and to ascertain what shall be the limits of longer and shorter distances.

There is in the above section also a provision to the effect that nothing in the act shall abridge or control the rates for freight which come from or goes beyond the State and for which less than local rates for carrying the same is charged.

By the sixth section the Commissioners are authorized and required to make for each railroad corporation a schedule " of just and reasonable " rates of charges for the transportation of passengers and freights and cars, and " said schedule shall in any suit brought against any such railroad corporation wherein is involved the charges of any such corporations for the transportation of any passengers or freight, or cars, or unjust discrimination in relation thereto, be deemed and taken in all courts of this State as sufficient evidence that the rates fixed therein are just and reasonable rates of charges for the transportation of passengers and freight and cars upon the railroads." The Commissioners are required to publish these schedules, and the railroad

JANUARY TERM, 1889. 315

P. & A. R. R. Co. vs. State of Florida—Opinion of Court.

companies to post them in a manner stated, and any such schedules purporting to be printed and published shall be received and held in all suits as *prima facie* the schedule of said Commissioners without further proof than its production with a certificate from the Commission of its being a true copy of the schedule prepared by them for the railroad company or corporation therein named, and that it has been duly published as required by law, stating the name of the newspaper, the date and place of publication.

This section also enacts that the Commissioners shall, from time to time, and as often as circumstances may require, change and revise the schedules.

Sections 7 to 13 inclusive, provide for a protest by the railroad company against the enforcement of any and all "rates of freight and passenger tariffs, or other rules and regulations" made by the Commissioners and a hearing and decision thereon by them, and for an appeal from the decision to a Board of Revisers, consisting of the Comptroller, Secretary of State, Commissioner of Agriculture, Attorney-General and the Treasurer of the State, and a hearing and decision by such Board. Section 14 gives the same right of protest to any individual, corporation, firm or partnership.

Section 5 enacts, *inter alia*, that if any railroad corporation, organized under the laws of this State and doing business therein, "shall wilfully charge, collect, demand or receive more than a fair and reasonable rate of toll or compensation for the transportation of passengers or freight of any description," it shall be "deemed guilty of extortion, and upon conviction thereof shall be dealt with as hereafter provided."

Section 17 provides that if any railroad company doing business in this State, by its agent or employees, shall be guilty of a violation of the rules and regulations prescribed

316 SUPREME COURT.

P. & A. R. R. Co. vs. State of Florida—Opinion of Court.

by the Commissioners, and, if after due notice of such viotion given to the principal officer thereof, ample and full recompense for the wrong and injury done thereby to any person or corporation, as may be directed by said Commissioners, shall not be made within thirty days from the time of such notice, such company shall incur a penalty for each offence of not less than one hundred, nor more than five thousand dollars, to be fixed by the presiding judge. This action is to be in the name of the State, and to be instituted by the Commissioners through the Attorney-General or a State Attorney, and in the county where the wrong was perpetrated.

Under section 19 all fines collected under the act are to be paid to the County Treasurer for county school purposes, and the rules of evidence in all cases under the act are the same as in civil actions, except as hereinbefore provided.

There are other features of the statute, but it is not necessary to set them out now. They give a personal remedy in addition to those provided by the common law, to individuals wronged by a violation upon the part of a railroad company of any rule or regulation of the Commissioners, and relate to matters of detail not necessary to an understanding of the statute in so far as either its general purpose, or its effect in the case before us is concerned.

The question of the extent of the power of the Legislature in the regulation of the charges of common carriers for carrying persons and property is not settled or defined.

The doctrine of the case of Munn vs. Illinois, 94 U. S., 113, it being one of the so-called Granger cases reported in that volume, is as follows: Where one devotes his property to a use which the public have an interest in, he in effect grants to the public an interest in such use, and the property, during such use, ceases to be a subject of mere private right, and the owner must, to the extent of that use,

submit to be controlled by the public for the common good so long as he maintains such use.   The devotion of it to the public use takes from him the right to make arbitrary or excessive charges for  its use by the public, and he must be content with a reasonable compensation.   In the absence of legislative regulation, what is a reasonable compensation is under the common law a matter  to be determined  by the courts, but this may be changed by  statute, and the Legislature may exercise it by prescribing  the maximum  rates of charges to  be made  by  common  carriers, ferries, hackmen, bakers, wharfingers and others of like avocations, and has often done so.

The cases upon which the controlling opinion in the Munn case is based recognize the right of  the owner of the property applied to public use, to  a  reasonable  compensation, and so does that opinion, yet, admitting that the Legislature may  abuse its power, that opinion says that " for protection against abuses by  the  Legislature  the  people must  resort to the polls, and not to the courts."

In Chicago, Burlington and Quincy Railroad Company vs. Iowa, 94 U. S., 155, another of the Granger cases, it is held  that railroad companies are carriers for hire; that they are incorporated as such and given extraordinary powers in order  that they may the better serve the public in that  capacity, and they are, therefore, engaged in a public employment affecting  the public interest, and, under the doctrine of Munn vs. Illinois, subject to legislative control as to their rates of fare and freight, unless protected by their charters.   This railroad company, says the opinion, p. 16., " has in the transaction of its business the same rights and is subject to the same control as private individuals under the same circumstances.   It must carry, when called upon to do so, and can charge only a reasonable sum for the carriage.   In the absence of any legislative regulation upon

the subject, the courts must decide for it, as they do for private persons when controversies arise, what is reasonable. But when the Legislature steps in and prescribes a maximum of charges it operates upon this corporation the same as it does upon individuals engaged in a similar business." It is also said : " That in the absence of a contract to the contrary in the charter, the company invested its capital, relying upon the good faith of the people and the wisdom and impartiality of legislators for protection against wrong under the form of legislative regulation."

In Stone vs. Farmers' Loan and Trust Company, 116 U. S., 307, 325, it is said : It is settled (in that court) that a State may limit railroad transportation charges within its territory unless restrained by some contract in the charter, or unless the regulation amounts to one of foreign or interstate commerce. In this opinion, after stating that the charter of the Baltimore and Ohio Railroad Company gives authority " to carry persons and property," it is remarked : " This of itself implies authority to charge a reasonable sum for the carriage. In this way the corporation was put in the same position as a natural person would occupy if engaged in the same or a like business. * * * The natural person would be subject to legislative control as to the amount of his charges. So must the corporation be."

Immediately following the above we find this very suggestive paragraph in the opinion : From what has thus been said it is not to be inferred that the power of limitation or regulation is itself without limit. This power to regulate is not a power to destroy, and limitation is not the equivalent of confiscation. Under pretense of regulating fares and freights the State cannot require a railroad corporation to carry persons or property without reward ; neither can it do that which in law amounts to a taking of private property for public use without just compensation

or without due process of law. What would this effect have we need not now say, because no tariff has yet been fixed by the Commission, and the statute of Mississippi expressly provides that in all trials of cases brought for a violation of any tariff of charges as fixed by the Commission, it may be shown in defence that such tariff so fixed is unjust.

This language is, unquestionably, greatly in restraint of that given above as used in the former or Granger cases, the purport of which, considered in the *abstract*, was that whatever the wrong done, the judiciary was powerless, and the resort to the polls at the periods prescribed by law the only remedy. Of course in many cases ruin might be effected or the injury consummated, to at least a great extent, before the people could be appealed to against the " power to destroy," or " confiscation," or " taking of property for public use without just compensation or due process of law." The language of the preceding paragraph would never have been used but in response to a conviction that some of the expressions of the former cases had gone too far.

If there be anything in the fact that Stone vs. Farmers' Loan and Trust Company differs from the several Granger railroad cases in that the Mississippi statute delegated the power to make rates to Commissioners, the same is the fact in the case before us. In the Granger cases the Legislature fixed the rates.

There is in the Munn case, p. 125, language tending towards the above paragraph from the Stone case, it being there said in reply to the argument that the Illinois legislation was repugnant to the Fourteenth Amendment, that " down to the Fourteenth Amendment it was not supposed that statutes regulating the use, or even the price of the use, of private property *necessarily* deprived an owner of his property without due process of law. Under some circum-

stances they may, but not under all." About the same idea is more briefly expressed in the last paragraph, on page 335, in the Stone case.

The extent to which this power of regulation by the Legislature may be carried in the absence from a railroad company's charter of a contract expressly authorizing it to charge up to a certain limit is a serious question, and one which we cannot evade in this case.

The third plea of the railroad company is: that it could not pay the expenses of operating its road by charging for transportation of persons and things the rates fixed for it by the Railroad Commissioners, or by charging less rates than those charged by it to the passenger named.

The demurrer of the State admits the averments of this plea to be true.

The admission of the demurrer is, that if the company had adopted the rates of transportation of passengers and freight, or had charged less than it charged the passenger, it could not have paid its operating expenses. The legal proposition asserted by the Circuit Court in sustaining the demurrer to this plea is, that the State may, through the instrumentality of the Commissioners, prescribe and may enforce through the courts, passenger and freight tariffs which do not pay the railroad company the expenses of operating its road; that the judgment or discretion of the Commissioners is conclusive as to the reasonableness of the rates as against the interference of the courts or any other power except it may be the Legislature. This judgment involves, of course, the conclusion that a rate of charges which is not sufficient to pay the actual necessary and reasonable expenses of operating the appellant's road is a reasonable rate, and neither a taking of its property without due process of law, or without just compensation, or anything else intimated by the paragraph from the Stone case

as being unauthorized. It is a plain declaration that the company must, as against any judicial relief, carry without reward if the Commissioners merely say so in a rule promulgated *according to the forms of the statute.*

The language of Chief-Justice Waite, given above, speaking for a majority of the court in the Granger cases, has. been appealed to, to sustain this conclusion. There is nothing in the facts of any of these cases which makes it an adjudication of the conclusion contended for. There was in the Munn case no issue or pretense that the warehouse charges prescribed by the Illinois statute were unremunerative; the real question was whether or not the warehouse property, as used, was subject to legislative regulation as to what should be a reasonable compensation. In the C., B. & Q. Railroad Company vs. Iowa, *supra*, the representation made by the bill was: that prior to the Iowa statute, prescribing rates, the lessee company had fixed its charges with a view to furnishing the greatest facilities for transportation at the lowest rates compatible with the duty of keeping the road in good condition, defraying the expenses of operation, paying interest on the indebtedness, and earning reasonable dividends for stockholders, and that the earnings had been barely adequate under careful and economical management for these purposes, and that these ends. could not be attained if the company should be compelled to conform to the statutory rates. If the bill had presented a case to the effect only that the statutory rates would not enable the company to defray the expenses of operation, including keeping the road in good condition, it would have approximated the issue now under consideration. In Peck vs. Chicago & N. R. Company, 94 U. S., 164, mortgage bondholders allege that the company's tariffs, in force before the passage of the Wisconsin statute limiting passenger and freight

charges, did not provide sufficient income " to pay interest on its debt, the legal rate of interest allowed by the laws of the State to its stockholders and expenses," and that the enforcement of the statute impaired the obligation of the contract between the bondholders and the company, and violated the prohibition in the State Constitution against taking private property without just compensation. In Lawrence vs. same company, same page, the bill was by stockholders, but substantially the same, and in the opinion in these two cases it is said, page 176: "In Munn vs. Illinois, and C. B. & Q. Railroad Company vs. Iowa, we decided that the State may limit the amount of shares by railroad companies for fares and freights, unless restrained by some contract in the charter, even though their income may have been pledged as security for the payment of obligations incurred upon the faith of the charter. So far this case is disposed of by these decisions." In C. M. &'St. P. Company vs. Ackley, 94 U. S., 179, the action was by the company to recover for freight *actually carried*, a compensation greater than the maximum rate fixed by the Wisconsin statute, and upon the ground that the amount sought to be recovered was no more than a reasonable rate, and it was held that as between the company and the freighter there was a statutory limitation for transportation " actually performed." " If," says the opinion, " the company should refuse to carry at the prices fixed, and an attempt should be made to forfeit its charter, other questions might arise which it will be time enough to consider when presented, but for the goods actually carried the limit of the recovery is that prescribed by the statute." The company having actually carried the freight, could not claim more than the statutory rate, but it is plain that the court felt that if it had refused to carry at such rate, other questions might arise. It does not appear that the company had even given notice to the shipper that

it would claim more than the statutory rate for the carrying to be done by it.

The enunciations of an opinion are not binding as authority except as to the points presented by the facts. of the case for adjudication. There is in none of the Granger cases any fact suggesting that the rates resisted were unremunerative. The same is true of the Tilley case, 2 Woods, 427 It is only as to the facts presented by the record that an opinion speaks authoritatively, none other are in the judicial mind. We are still not remitted solely to this doctrine, and a critical view of the facts of the Granger cases to ascertain the meaning of the majority of the court for whom the late Chief Justice was speaking in them. In the paragraph quoted from the Stone case that venerated Judge clearly limits the effect of the broader language used on the former occasion, and his limiting words are repeated after his death nearly in full, in the opinion in the case of Dow vs. Beidel man, 125 U. S., 689. These words show, and were, we think, intended to show that there was a limit to regulation, even if it be that those used in the Munn case in relation to the Fourteenth Amendment were not so intended. In Georgia R. & B. Company vs. Smith, 128 U. S., 174, decided last October, Field, J., speaking for the entire court, says that the adjudications of that court are that the power of the State Legislature to regulate railroad fares within the limits of the State is subject to the limitation that the carriage is not required without reward or upon conditions amounting to taking property for public use without just compensation, or that what is done does not amount to a regulation of foreign or interstate commerce.

We do not think the Granger cases to be authority for the proposition that the Legislature, acting even for itself, and not through Commissioners, is omnipotent as against every one but the people in the matter of regulating rates, except

to the extent that they may control profits. They seem to hold that the Legislature may itself go this far as to profits, even confining the language of the opinions to the facts, in one or more of the several cases. There is, under the plea mentioned, no question before us as to what the profits shall be. Admitting for the purposes of this case that between the line just above a compensatory rate and one defining excessive charges, or extortion, the discretion of the Legislature may be conclusive as against judicial interference, or even admitting that in the exercise of a legislative discretion the law making power may itself prescribe for common carriers rates that will not compensate, and that the courts cannot prevent the enforcement of them, we yet do not think that any such power exclusive of judicial inquiry has been given, if it could have been, to the Railroad Commissioners by our statute. Of course no such power was given to the Mississippi Commissioners ; it could be shown " in defence " that there rates were unjust, and were, therefore, subject to both judicial and of course, legislative supervision or control as to their reasonableness, as is clear from the statement of facts in the Stone case, 116 U. S., p. 314.

The grant to the appellant company of the " power  *  * to make, build, maintain, equip, use and operate a railroad" between the points designated, particularly when considered in connection with another provision of its charter act, to the effect that it shall not charge more than five cents per mile for passenger transportation, and making the exaction of a greater sum by any officer or agent of the company a misdemeanor, (sections 1 and 8, chapter 3335,) gave it authority to charge a reasonable sum for the carriage of persons and property. The duty of a railroad company to carry and charge only reasonable compensation are incidents of its occupation as a common carrier. The authority to carry implies authority to charge a reasonable compensa-

tion for the carriage. Winona & St. Paul Ry. Co. vs. Blake, 94 U. S., 180; Stone vs. Farmers' Loan and Trust Company, 116 U. S., 329. To earn money is a purpose and legitimate object of a railroad company. Though a public highway and subject to public control as such in many respects, yet it differs from the ordinary public highway in the feature of being private property. A railroad and its equipment represent the private capital invested in them, and the income from the operation of the same is looked to and relied upon for the expense of at least the maintenance and operation. This is the ordinary rule, and in view of the particular pleadings now under consideration is the one applicable here.

To require of a railroad company which has been incorporated and given power to construct and operate a railroad, and charge reasonable rates for the transportation of persons and property, and has already constructed its road, that it shall carry persons and property at rates of charges not sufficient to pay expenses of operating the road is, as a matter of fact, to compel it to carry, without reward, and to take the use of its property without just compensation. The same would be equally true of a natural person who might be authorized to operate a railroad, and upon whom after he had built and equipped his road, the law-making or other power should enforce such terms of business. A railroad is of no value except in the use of it; kept in idleness, it is a source of expense and subject of decay. Operated without remuneration its ruin is hastened, and a constant accumulation of indebtedness becomes an inseparable incident to its ownership unless means from independent sources are applied to the cost of its maintenance and operation, and if this is done the enforced consumption of such means is in its character of the same effect upon the owner. It is the duty of a common carrier to receive and carry whatever is properly offered to it for carriage. As to freights, it

is an insurer, and its liability, unless limited. by special agreement, extends to all losses not occasioned by the act of God or the public enemy. For injuries occurring to passengers from the unsafe condition of the roadbed, or from insufficient or defective equipment or unskillful and negligent management, the company is responsible in damages. The safety of human life and the good of every public interest require of them the soundest condition, the fullest equipment and most skillful and careful operation; and it is the province of the courts to enforce, when properly called upon, the law which imposes these entirely proper and indispensable demands. A railroad which cannot earn enough to pay its operating expenses because it is not permitted by the State to charge rates sufficient for such purpose, must as a natural result of such State regulation, become a nuisance and a menace to human life. Assuming that a railroad company can be compelled to operate its road, the result follows, if its rates of charges be fixed against its will at less than the cost of operation, that its property is used for the benefit of the public without reward or just compensation. If it can be compelled to operate for a little less than the expenses of doing so, so can it for much less. This principle is made more onerous, but not more unjust, by the greater degree to which the exercise of the power may be carried. These propositions, as matters of fact, seem to us entirely true. If the rates prescribed by the State or a Commission, will not pay operating expenses, and the company is thereby compelled to stop its operations, the company is deprived of the use of its property, and it is, in effect, rendered valueless.

In Pumpelly vs. Green Bay Co., 13 Wall., 166, it was held that by " the general law of European nations and the common law of England, it was a qualification of the rights of eminent domain that compensation should be made for private property taken or sacrificed for public use; and the consti-

tutional provisions of the United States and of the several States which declare that private property shall not be taken for public use without just compensation, were intended to establish this principle beyond legislative control; it is not necessary that property should be absolutely *taken*, in the narrowest sense of that word, to bring the case within the protection of this constitutional provision. There may be such serious interruption to the common and necessary use of property as will be equivalent to a taking, within the meaning of the Constitution; the backing of water so as to overflow the lands of an individual, or any other superinduced addition of water, earth, sand, or other material or artificial structure placed on land, if done under statutes authorizing it for the public benefit, is such a taking as by the constitutional provision demands compensation.

An injury resulting directly to a railroad company from the action of Railroad Commissioners as to it is, we think, easily and clearly distinguishable from indirect and consequential damage resulting from public improvements. Transportation Company vs. Chicago, 99 U. S., 635.

Railroads are not in themselves, or necessarily, public nuisances, and detrimental to the public morals, public health, or public safety. While their operation in many, if not all, respects, calls for the exercise of special skill and eminent care, and they are to be so used as not unnecessarily to injure another, as is all private property, and their use may, to a certain extent, be regulated, they cannot, nor can their ordinary use, reasonably be declared to be prejudicial to the general welfare. It belongs, of course, to the legislative department to exert what is known as the police powers of the State, and to determine primarily what measures are appropriate or necessary for the protection of the morals, the health or the safety of the public, but, says the Supreme Court of the United States, in Mugler vs. Kansas, 123 U. S., 661; it does not follow that every statute enacted osten-

sibly for the promotion of these ends is to be accepted as a legitimate exertion of the police powers of the State ; there are of necessity limits beyond which legislation cannot rightfully go. * * * " The courts are not bound by mere forms, nor are they to be misled by mere pretences. They are at liberty, indeed, are under a solemn duty, to look at the substance of things whenever they enter upon the inquiry whether the Legislature has transcended the limits of its authority. If, therefore, a statute purporting to have been enacted to protect the public health, the public morals or the public safety, has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge and thereby give effect to the Constitution." In this case it was held that the destruction, through the exercise of the police power, and without allowing compensation, of the property used in violation of law in maintaining a public nuisance, is not taking of property for public use, and does not deprive the owner of it without due process of law; and that a State has the constitutional power to declare that any place kept and maintained for the illegal manufacture and sale of intoxicating liquors shall be deemed a common nuisance and be abated. It is said in the opinion : that we cannot shut out of view the fact, within the knowledge of all that the public health, public morals and public safety may be endangered by the general use of intoxicating drinks, nor the fact, established by statistics accessible to every one, that the idleness, disorder, pauperism and crime existing in the country are in some degree at least traceable to this evil.

Certainly railroads cannot be classed with intoxicating liquors, or with property used in their manufacture and sale, as subjects of the public power to the extent of being liable to be taxed or destroyed, or their use be prohibited, without compensation, as dangerous to the health, morals or safety

of the public. The police power rests " upon the fundamental principle that every one shall so use his own as not to wrong or injure another," 123 U. S., 667, and there is not in a railroad, kept in good condition and operated properly, anything offensive to this maxim. A statute which should propose to make all railroad property existing at the time of its enactment, a nuisance, if its ordinary use as such should be continued after a certain future day, and prohibit its use after such day without providing compensation for the loss sustained from the prohibition of such use, would, we think, upon the doctrine of Mugler vs. Kansas, be unconstitutional. The limit to the exercise of the police power, says Judge Cooley, must be this : The regulation must have reference to the comfort, safety or welfare of society ; they must not be in conflict with any of the provisions of the charter ; and they must not, under the pretense of regulation, take from the corporation any of the essential rights and privileges which the charter confers. Cooley's Constitutional Limitations (5th edition), m. p. 577 ; Jackson vs. Michigan Plank Road Co., 9 Mich., 285 ; Pingry vs. Washburn, 1 Aikin, 264.

Neither in our Railroad Commission law, nor in the constitutional provision upon which it is based, is there anything which of itself declares or implies such a prohibition, or contemplates the making of one by the Commissioners, yet if the enforcement of the rates prescribed by the Commissioners would have this effect upon the railroad in question, we think, considering the particular pleadings now under discussion, it would be, as against the railroad company, an infraction of the provision of our declaration of rights (section 12), that no person shall be deprived of his property without due process of law, nor shall private property be taken without just compensation.

The Railroad Commissioners have prescribed a passenger rate of three cents per mile as a reasonable and just rate for

the appellant company.   In the case before us the company
has charged at the rate of 4 11-26 cents, or, in other words,
have charged about 50 per cent. more than the Commis-
sion rate.   Upon the pleadings the State contends that
the Commissioner's rate is reasonable and just, and
that of the railroad company unreasonable and un-
just, yet it admits that the railroad would not have
earned expenses of operation if it had carried at the
schedule of passenger and property rates fixed by the Com-
mission, or by charging it at a less rate than that which the
passenger in this case was required to pay.   What the Com-
mission rates for carring property are, we are not advised.
We only know then that the Commissioners have prescribed
such rates generally, as the State admits, will not pay the
operating expenses, and these include a passenger rate of
three cents.   The legal problem involved in these facts is,
whether the action of the Commission is to be regarded as
conclusively lawful, and within the limits of their powers,
or as beyond them and infringing the constitutional rights
of the company.

   We have found no case which holds that a railroad com-
pany can be compelled to carry at unremunerative rates.
In Chicago and Northwestern Railway Company vs. Dey,
*et al.*, the Iowa Railroad Commissioners, 13 Railway Age,
500, decided by Judge Brewer of the United States Circuit
Court (see also C., B. & Q. Railroad Co. vs. Dey, *et al.*, 5
Railway and Corporation Law Journal, 203,) it was held
that where the rates prescribed will not pay some compen-
sation, the courts may give protection against their enforce-
ment.   Some rule, he says, must exist, fixed and definite,
to control the action of the courts, for a chancellor is not at
liberty to substitute his discretion as to the reasonableness
of rates for that of the Legislature ; the Legislature has the
discretion, and the general rule is that where any officer
has discretion, his acts within the limits of that discretion

are not subject to review by the courts. Decisions of the Supreme Court, he says, seem to forbid such a limit to the power of the Legislature as that its lowest rates must allow a profit equal to the lowest current rate of interest (say 3 per cent.); and the right of judicial interference exists only where the schedule of rates established, will fail to secure the owners some compensation or income from their investment, and when some compensation is allowed by the rates, the question becomes one of legislative policy. In Dow vs. Beidel. man, 125 U. S., 680, the evidence showed that under the maximum passenger tariff of three cents, prescribed by the Arkansas statute, the net income of the road, with its existing traffic, would pay less than one and a half per cent. on the original cost of the road, and only a little more than two per cent. on the amount of the bonded debt, without any proof, however, of the cost of the bonded debt or the amount of the capital stock, or of the price paid for the road, and this was held not to be a taking of the property without due process of law, and that the court had no means, under the facts, of determining, if it could under any circumstances, that the rate of mileage was unreasonable. Though in the case of State vs. C. M. & St. P. Co., 38 Minn., 281, it was held that the determination of the Commissioners as to what are equal and reasonable fares and rates is conclusive, and that in proceedings by mandamus to compel compliance with the rates recommended and published by them, no issue can be raised, or inquiry had on that question, still that was not a case involving the entire rates, but only the rate on one article, and there was no contention that the entire tariffs as prescribed by the Commissioners would not pay operating expenses. The fact that the tariff on *simply one or several* articles may be unremunerative is not ground for an assumption that the tariffs are so *as a whole*, nor reason to our minds for judicial interference in behalf of the railroad company.

Whether under a general law for the incorporation of railroads, like ours, where there is practically no restriction upon the number of railroads that may be built and operated, the construction of additional roads in a section of the State *already amply supplied with such transportation facilities*, would present a case in which the exaction of prohibitory or otherwise onerous rates may be prevented, though it result in an impossibility for some or all of the roads to make expenses, we need not say; no such case is before us. When it is said by the Interstate Commerce Commissioners, in Cotton Exchange vs. C., N. O. & T. P. Co. *et al.*, decided November 26, 1888, that " where there are more roads than the business, at fair rates, will remunerate, they must rely upon future earnings for the return of *investments* and *profits*," we do not understand them to have meant that such roads must rely also on the future for *expenses* also. The road there in question was making more than its expenses, but not enough to pay these and interest or fixed charges. In view of the undeveloped state of the law, each case must be decided upon its facts as it arises.

Confining ourselves to the case made by the pleadings, where only one railroad is shown to traverse the territory in question, and on the one hand the Commissioners say the company must not charge more than three cents, although it will compel a loss of money, and the company says it cannot pay operating expenses at the rates of freight and passenger charges prescribed by the Commissioners, or without charging four and 11-26 cents per mile, our opinion is that the action of the Commissioners in prohibiting the larger rate is a palpable abuse of their discretion and a trespass upon the rights of the company, and one which, if enforced with the freight rates prescribed, would amount in law and in fact to taking the property of the company without just compensation. It is not a reasonable rate, considered either with reference to the interests of the peo-

ple or those of the railroad company, or both. If the enforcement of these rates is persisted in it must end in the dilapidation of the road and imperil the lives and property of the people, and finally destroy an avenue of transportation which conveys persons in from, say, seven to nine hours, and at a cost of say $7.25 (estimating the rate at $4\frac{1}{2}$ cents per mile), over a distance of 161 miles, which, before, it would have taken several days to travel through the same territory by the ordinary roads, at far greater expense, or, in the particular case before us, carrying a passenger twenty-six miles in less than an hour and a half for one dollar and twenty-five cents, when, before construction of the road, the only means of conveyance was private conveyance or a hack line, at the slow speed and personal inconvenience incident to such primitive mode of travel, including the passage of a river on an ordinary ferry. It would be idle to say that we cannot take judicial notice of the ordinary modes of conveyance formerly existing in this section of the country, or that the only means of railroad travel from the western portion of West Florida to the middle and eastern portions of the State were through the adjoining States of Alabama and Georgia.

Whether or not, as a matter of *fact*, the rates prescribed by the Railroad Commission will, including also its earnings from all sources of commerce beyond the control of such Commissioners, pay its operating expenses, is something which we are not called upon to express an opinion on. What we say is based simply upon *the admission made by the demurrer to the third plea.* Upon an issue being joined on this plea, every source of income of the railroad company can be inquired into, and the necessity and reasonableness of every expense investigated and settled. It is not, as a matter of fact, to be presumed, outside the admissions of this demurrer, that the Commissioners would impose upon this railroad a rate of three cents under the circumstances indi-

cated by the plea, if they thought, considering also the rates of freight adopted by them, that the company could not pay its operating expenses without charging at the passenger rate it has charged in this case. Under the statute the burden will be upon the company to make out a *prima facie* case sustaining its plea before the State will be called upon to introduce any evidence, and if this be done by the company, the State must then, through the instrumentality of its Commissioners and any other proper means, establish the justice of the action of the Commissioners in fixing the schedule of *passenger and freight rates* against the arraignment which the company has made of them in its third plea.

Although what we have said assumes that the Legislature either cannot, or has not by the statute, shut out all judicial inquiry as to whether the Commissioners by their action may deprive a common carrier of any constitutional right, or have exceeded the powers given them, yet it is proper to say a few words on the subject.

" Sufficient," as defined by Webster, means "adequate to suffice, equal to the end proposed, competent." Whether, in view of this definition, the word sufficient, as used in the statute, can be held to mean conclusive, may be a subject of debate if we look simply at the language just quoted from the statute. In prescribing the powers of the Commissioners the statute has authorized and required them to make " *reasonable and just* " rates of freight and passenger tariffs, and to make schedules " of just and reasonable " rates. Another section of the statute enacts that if a railroad company shall wilfully charge more than " a *fair and reasonable* " rate of toll or compensation for the transportation of passengers or freight, it shall be deemed guilty of extortion. It is apparent throughout the act, as is shown by extracts from it in the first pages of this opinion, that the purpose of the Legislature was to secure nothing but reasonable and just rates, and in this the statute is in harmony with the Consti-

tution. The purpose of the provision making the schedules evidence was not to define the powers of the Commissioners, it was to make or declare a rule of evidence, and relieve the State or person suing a railroad company under the act, from the burden of proving all the facts and details which would otherwise be necessary to entitle the plaintiff to a recovery in the absence of evidence in behalf of the company. All facts and details as to rates lie more peculiarly in the knowledge of the railroad company, and it is entirely reasonable that it should be visited with the burden of overthrowing the correctness of any rates established by a Commission by the introduction of such facts and circumstances. The purpose of this provision being, then, a means adopted, not to secure reasonable and just rates, but to relieve the plaintiff from a more onerous rule of evidence, we think that sufficient does not mean " conclusive." Again, the harshness of the rule that a schedule shall be conclusive, would itself tend against such construction, where there is any doubt. To *authorize* and *require* a ministerial body to make reasonable and just rates, and yet provide that proof of its action thereunder shall be conclusive evidence that their action was proper, and, no matter what the circumstances, that it could not be inquired into or questioned, would be very extraordinary legislation. The questionable character of any such legislation favors, of itself, a different construction. C. & C. Railroad Company vs. People *ex rel.*, 67 Ill., 11. In our opinion the effect of the provision was to provide a new mode of proving the reasonableness and just character of the rates, and make such proof competent and adequate evidence of the correctness of the action of the Commissioners, in the absence of countervailing proof that they have exceeded their powers or clearly abused their discretion and invaded some right of the railroad company. There is nothing in

Ga. R. R. vs. Smith, 70 Ga., 694, inconsistent with this view.

It is argued that the State has granted to the appellant company more than three million acres of lands, to say one thing as to lands enuring to it from the general government, and that this large grant of land was the security upon which appellant reposed together with future earnings when it constructed a railroad through a country with only eight inhabitants to the square mile.

It is true that by one section of the charter act of this company, the State granted to it, " to aid in the construction of the road, the alternate sections of land lying within six miles of and on each side of the road, granted by the United States to this State by the act of September 28, 1850," commonly known as the swamp and land act; and by another section it granted to the company, "in consideration of the benefits that will accrue to the State from the construction of such railroad," twenty thousand acres per mile, for each mile the company may grade, cross-tie and iron, the lands to be of those granted to the State by said act of Congress, and lying " nearest the line of said railroad and extensions, and *not otherwise granted.*"

There is nothing in the pleadings of this case to indicate what quantity of land, if any, has been actually received by the company under either of these grants; nor upon this demurrer, or the entire pleadings, can we assume that the rates have been fixed by the Commission with regard to the reception by the company of any land under such grants. It would, in view of the pleadings and the consequently limited attention given the subject in argument, be entirely gratuitous, for us to say anything as to what part the land grant can properly play in the matter of fixing rates. Upon issues properly made up, in fact upon an issue joined on this plea, if it be that the land or any of it actually received by this company, is applicable to expenses of operation, or

would otherwise go to a reduction of rates to be charged the people, on passenger or freight transportation, it can be shown in support of such rates, should it become necessary to do so.

The same may be said as to the lands granted to the State by the act of Congress of May 17, 1856, which the 16th section of the company's charter act provides the company shall have.

The demurrer of the State, in so far as it is applicable to the third plea, should have been overruled.

II. The fourth plea sets up a series of facts, which are claimed to constitute a defense to the action, and are alleged to have been presented to the Commissioners and the Board of Revisers as reasons against the enforcement of their rates. They are:

(*a.*) The railroad was completed in April, 1883, when the company began to operate it, and is 161 miles long. Its construction and equipment cost $3,345,080. That the Commissioners' rates are very much less than those heretofore charged by the company, and the company has failed to realize from the operation of its road, upon the latter charges, enough to meet the necessary expenses of the operation and ownership of the road, and the operation of the road from April, 1883, has been prudent, economical and judicious, and with an eye single to the increase of income and decrease of expenditures.

(*b.*) That from April, 1883, to June 30th, 1884, (4¼ years) the gross earnings exceeded the bare expenses of operation (including taxes) only by $52,662.50, or thirty-six and sixteen seventeen-hundredths of one per cent. per annum upon the actual cost of the road and its equipment; and the cost of the actual and necessary repairs and current employment largely exceeded said ostensible excess of $52,662.50.

(*c.*) For the year ending June 30th, 1887, the excess of the operating expenses (not including taxes) over the in-

22

come from all sources, was $4,234.52. The taxes were $17,069.15, and with said excess aggregate $21,303.67.

(*d.*) For the period from June 30th, 1887, to March 1st, 1881, (and thereafter in like proportion) the excess of the operating expenses of the road over income from all sources has been $15.834.87.

(*e.*) That West Florida, through which the road runs, has only eight inhabitants to the square mile. That along the entire route from Pensacola, a city of 12,000 or 15,000 inhabitants, to River Junction, there are but two towns exceeding 1,000 inhabitants, and but three which exceed 250 inhabitants. The main staple for shipment is lumber, for the transportation of which numerous streams vie with the company at a rate much cheaper than it can afford.

(*f.*) That the rates of freight and passage over the line of the road from points off to points on, and from points on to points off, are fixed and determined by competition upon a basis much lower than those fixed by the Commissioners, and cannot be increased by the defendant.

(*g.*) That at the beginning of the partial operation of the road, viz: from August 5th, 1883, to February 1st, 1885, the local rates were as follows :

Agents—1st class rates 4½ cents per mile.

Agents—2d class rates 3½ cents per mile.

Conductors—1st class rates 5 cents per mile.

Conductors—2d class rates 4 cents per mile.

Round trip rate 7 cents per mile.

During the existence of these rates nearly 90 per cent. of the passengers traveled on the 3½ cent rate. The above rates were found to be entirely unremunerative, and the 3½ and 4 cents rates were abolished on February 1st, 1885. That this change did not result, and has not resulted, in the decrease in the number of local passengers, but immediately upon such change the gross income from the transportation

JANUARY TERM, 1889. 339

P. & A. R. R. Co. vs. State of Florida—Opinion of Court.

of such passengers, which had prior thereto been not only unremunerative, but practically of unvarying amount, increased fifteen per cent. for the ensuing year, which increase has been maintained with uniformity since that time.

(*h.*) That at the beginning of the completed operation of the road, defendant established rates of local freight at a rate deemed by it to be remunerative, which continued in force till January 1st, 1885, when, to induce transportation, defendant reduced the rates upon the commodities constituting more than three-fourths of the freight, to a point much below the former rate, although above the rates fixed by the Commissioners, but this reduction did not cause, and has not caused, any increase in the quantity of freight transported, or in the gross income therefrom, but the income decreased, and has remained less than it was before the reduction.

There are also assertions in the plea to the affect that "in all human probability" the deficits indicated in the first four paragraphs of the plea will continue for some years to come, as the completion of roads having a shorter distance to operate between desirable points to be reached over defendant's road must and will prevent, in a large measure, any increase of through business or through business rates; and that the sparseness of the population and the meagreness of the products to be shipped by rail through the country through which the road runs prevents, and will prevent, any increase in the value of the local business which might otherwise result from a reduced rate; and that a reduction of rates to those prescribed by the Commissioners would compel defendant to forego any possibility of earning any interest on its investment or any income from the operation of the road, and to continue the operation of it at an irretrievable loss, and render the line valueless for purposes of either operation

or sale.   These assertions are, however, rather the expression of opinions and apprehensions than facts admitted by the demurrer.

An admission by the State, or even by the Commissioners, of the facts stated in this plea, is not an admsssion that the rates prescribed by the latter would not be remunerative. As was said·by Judge Woods, in the Tilley case, a reduction of rates is not always followed by a reduction of income, either gross or net.   It can soon be settled which is right— the railroad company's officers or the Railroad Commission —in their view of the effect of the latter's tariff rates, by allowing the tariff to go into operation.   2 Woods, p. 452. A different management from that now controlling the appellant company might agree with the Railroad Commissioners and adopt the tariff proposed by them, and yet another management might put in force rates distinct from either. The Railroad Commissioners must be presumed by the courts to understand railroad business, and to have in careful keeping the real interests of the railroads.   The intricacy of the subject of tariff and freight rates, the importance of the interests involved, and the difficulty of courts dealing efficiently with the matter in ordinary suits, even considering merely the time that would be consumed, has led to the establishment and maintenance of Commissioners at the expense of the people.   Their mission is to do justice as between the people and the railroad companies ; they are not expected or presumed to place any restrictions upon a railroad except those clearly necessary to effect the purposes of the Constitution and the legislation under it. 70 Ga., 694.   Where a tariff has been fixed by a Commission it must be tested by experiment, unless it is shown or appears upon its face to be destructive of the railroad's interests.   Neither the courts nor the railroad company can substitute its judgment for that of the Commission where

there is room for difference of intelligent opinion. A different rule from this would install a presumption that the Commission neither knew their duty nor desired to do it. Like all officers, they will be presumed to know and do their duty until the contrary is shown. Under circumstances which admit of no difference of opinion, or when it is admitted upon the record, as in the case of the third plea considered above, that the Commission rates are unremunerative, their enforcement becomes a wrong, for which there may be no remedy but in the courts ; but where there is room for honest judgment as to whether or not such rates will prove remunerative, the judiciary should not interfere. Avery vs. Fox, 1 Abbott's U. S. C. C. Reports, 246.

When the above case of C., B. & Q. Railroad Company vs. Dey *et. al* came again before Judge Brewer last February, upon supplemental bill, the facts as presented by the new pleading showed that the effect of the tariff of rates fixed by the Commissioners was doubtful, with a seeming probability, however, of their proving compensatory, and the amount of business to be effected was small, he held that the result should be left to the test of experience, and refused a preliminary injunction, and dissolved the restraining order previously made. 5 Railway and Corporation Law Journal, 203.

This is not a good plea.

III. The first plea is that the rate charged for the transportation of the passengers was a reasonable, and the second plea, that the one fixed by the Commission was less than a reasonable rate.

These pleas speak not as to the unreasonableness of the tariffs prescribed by the Commissioners, considered as an entirety, but simply as to the passenger rate. The case of State vs. C., M. and St. P. Railroad Company, *supra*, de-

cided by the Supreme Court of Minnesota, is somewhat in point as applicable to these pleas.

As between the railroad company and a passenger, or the former and the State, we do not think that the company can question before the courts a particular tariff, on the simple ground that it is in its judgment unreasonable, or can invoke the interference of the court as against the judgment of the Commissioners that it is unreasonable. The courts have no power to make freight and passenger tariffs. In C., B. and Q. Railroad Company, vs. Dey *et al.*, 5 R. and C. L. J., 203, Judge Brewer, in speaking of his former decision in the same case, says (p. 204): in the injunction which was issued there was no assumption of power to prescribe rates, and no pretense of interfering with the Commissioners in the discharge of any duties imposed on them by the statute.

IV. In view of the conclusions announced as to the third plea, the judgment in each of the cases mentioned in the first paragraph of this opinion must be reversed, and a new trial granted. Judgments will be entered accordingly.