110 So.2d 401 (1959)
STATE PLANT BOARD, a body corporate under the Laws of the State of Florida; W.G. Cowperthwaite, As Plant Commissioner; and Charles Poucher, Individually, and as agent of said Board, Appellants,
v.
Walter A. SMITH and wife, Mildred C. Smith, Appellees.
No. 29609.
Supreme Court of Florida.
March 25, 1959.
*403 Richard W. Ervin, Atty. Gen., Ralph E. Odum, Asst. Atty. Gen., Joseph O. Macbeth, Sebring, and M.H. Edwards, Bartow, for appellants.
H.C. Crittenden, Winter Haven, G.B. Fishback, Orlando, Robert L. Staufer, Winter Haven, Harry Lee, Sebring, and Edward J. Hanlon, Jr., Winter Garden, for appellees.
ROBERTS, Justice.
This is an interlocutory appeal from an order of the lower court holding unconstitutional all of § 2 of Ch. 57-365, Laws of 1957 [§ 581.17(2), Fla. Stat. 1957, F.S.A.], except the first paragraph thereof, and declining to dismiss the plaintiff-appellees' suit for injunctive relief against the appellant, the State Plant Board, upon its motion.
The Act in question was adopted by the Legislature following the decision of this court in Corneal v. State Plant Board, Fla. 1957, 95 So.2d 1, 4, and with direct reference thereto in the Preamble to the Act. In the Corneal case this court held that the so-called "pull and treat" program adopted by the State Plant Board ("the Board" hereafter) under general legislative authority for the containment and eradication of a citrus disease known as spreading decline, caused by a burrowing nematode, could not be carried out on a compulsory basis without compensating the grower for "at least, the loss of profits sustained by the owner whose healthy trees are destroyed under the compulsory program of `pull and treat' * * *." The nature of the disease and the Board's program for its control and eradication are discussed at some length in that opinion, and this discussion will not be repeated here. It suffices to say that the burrowing nematodes infest and attack the lower root system of a citrus tree and, eventually, cause the tree to "decline" and to become commercially unprofitable; and the Board's program calls for the destruction, according to a set formula, of both infested and noninfested trees and the fumigation of the soil in the cleared area.
Section 1 of the 1957 Act, supra, provides that "[t]he citrus disease known as spreading decline, caused by the burrowing nematode is hereby declared to be a dangerous public nuisance"; and in the first paragraph of § 2 of the Act the Board is directed to carry out a compulsory program of containment and eradication of the disease, including the destruction of infested trees and fumigation of the soil, in accordance with the rules and regulations of the Board. (These portions of the Act were not disturbed by the Chancellor in the order here reviewed.) The remaining provisions of § 2  held unconstitutional by the Chancellor  provided for the payment of "reasonable compensation not to exceed $1,000.00 per acre" for the destruction of uninfested trees, set out a formula for the guidance of the Board or its agents in determining "just and fair compensation" to be paid to the grower for the destruction of such trees, provided for a hearing before the Board as to the adequacy of such compensation, *404 and for judicial review of the Board's administrative determination in this respect. The Act specifically provided that no compensation should be paid for the destruction of infested trees.
While not expressly so provided, it is the clear implication of the Act  and the Board has so interpreted it  that the compulsory program of "pull and treat" may be carried out summarily in any citrus grove in which the burrowing nematodes are found by the Board's agents, and that the grove owner is entitled to an administrative and judicial hearing on the sole question of the adequacy of the compensation to be paid to him  and this only after the trees, infested and non-infested, have actually been destroyed.
In their complaint the plaintiffs-appellees attacked the statute on the grounds, inter alia, that it authorized the taking of their property without due process of law and without just compensation, contrary to the Florida and federal constitutions [§ 12, Declaration of Rights, Fla. Const., F.S.A; 14th Amend., U.S.Const.], and that it also violated § 29, Art. 16 of the Florida constitution, F.S.A. prohibiting the taking of property for public use unless full compensation therefor "shall be first made to the owner, or first secured to him by deposit of money." The Board based its motion to dismiss principally on the decision of this court in Corneal v. State Plant Board, supra, 95 So.2d 1, urging that the statute "tracked" in every respect the mandate of this court in that case and that the only question for judicial determination was the reasonableness of the compensation to be awarded plaintiffs for the destruction of their non-infested trees.
In his order here reviewed the Chancellor held that, insofar as the statute authorized the summary destruction of infested trees, it met the constitutional requirements of due process; but that "[t]he attempt of the Legislature * * * to empower the State Plant Board to destroy healthy trees before compensation shall be paid or secured to the owner, and the further attempt by said act to place a ceiling of $1,000 per acre as compensation for healthy trees so destroyed and providing that said payment should be made only after such destruction, violates the provisions of Section 12 of the Bill of Rights, Florida Constitution, and also Section 29, Article 16 of the Florida Constitution." He interpreted the opinion of this court in the Corneal case as requiring "full compensation" to be made to the grove owner and opined that "any attempt by the Legislature to place a ceiling on compensation that is less than the fair market value of the property destroyed or that attempts to destroy Plaintiffs' healthy trees before compensation shall be paid or secured to Plaintiffs is clearly unconstitutional."
We will first dispose of the question of whether the destruction of citrus trees in this situation is an appropriation of private property for public use within the intendment of § 29 of Art. 16 of the Florida constitution. We think the conclusion is inescapable that it is not.
There is a very clear distinction between an appropriation of private property to a public use in the exercise of the power of eminent domain, and the regulation of the use of property  and its destruction, if necessary  in the exercise of the police power. "Under the power of eminent domain the sovereign may make a compulsory purchase of the property of the citizen when such property is to be appropriated to a public purpose or use, but such compulsory purchase, or taking as it is called, cannot be made even by the sovereign `without just compensation'". Moody v. Jacksonville, T. & K.W.R. Co., 1884, 20 Fla. 597, 606. Or, stated differently, in the exercise of the power of eminent domain the sovereign "compels the dedication of the property, or some interest therein, to a public use, or, if already dedicated to one public use, then to another." State ex *405 rel. Lamar v. Jacksonville Terminal Co., 1900, 41 Fla. 377, 27 So. 225, 237. See also Adams v. Housing Authority of City of Daytona Beach, Fla. 1952, 60 So.2d 663.
On the other hand, the police power is exercised by the sovereign to promote the health, morals and safety of the community, Adams v. Housing Authority, supra; it rests "upon the fundamental principle that every one shall so use his own as not to wrong or injure another." Mugler v. State of Kansas, 123 U.S. 623, 661, 667, 8 S.Ct. 273, 300, 31 L.Ed. 205, quoted in Pensacola & A.R. Co. v. State, 1889, 25 Fla. 310, 5 So. 833, 3 L.R.A. 661. "`To destroy property because it is a public nuisance is not to appropriate it to public use, but to prevent any use of it by the owner, and to put an end to its existence, because it could not be used consistently with the maxim, sic utere tuo ut alienum non laedas.'" Bowman v. Virginia State Entomologist, 1920, 128 Va. 351, 105 S.E. 141, 145, 12 A.L.R. 1121, quoting 1 Lewis on Eminent Domain, 3d ed., § 247.
It is abundantly clear, then, that the Act in question was enacted in the exercise of the police power of the sovereign state and not in the exercise of the power of eminent domain. Accordingly, it must be held that the able Chancellor erred in testing the validity of the Act by the organic requirements contained in § 29 of Art. 16.
But the Chancellor also stated in the order here reviewed that the Act "violates the provisions of Section 12 of the Bill of Rights, Florida Constitution". While the language of the order appears to be referable only to a violation of § 29 of Art. 16, the issue as to a violation of § 12 of the Declaration of Rights was made by the pleadings; this being so, this court's decision, on appeal, "must be made, not on the basis of whether the trial court or chancellor traveled the proper route, used proper reasoning, or laid his conclusion on proper grounds, but rather on whether his conclusion is correct or incorrect." Chase v. Cowart, Fla. 1958, 102 So.2d 147, 150.
So the fact that § 29 of Art. 16 is not applicable to the Act does not dispose of the case. There still remains the question of the impact of the provisions of § 12 of the Declaration of Rights, Fla. Const. of 1885, prohibiting the taking of private property without due process of law and without just compensation. And it might be noted that the provisions of our constitution guaranteeing these sacred and basic rights ante-date by almost fifty years the organic limitations imposed by § 29 of Art. 16. These provisions have been incorporated in all of our state constitutions, from that of 1838 up to and including our present constitution of 1885. Section 29 of Art. 16, which was new in the constitution of 1885, merely specified additional organic limitations upon the exercise of the power of eminent domain by "any corporation or individual" over and above those already imposed on the exercise of this power by the "due process" and "just compensation" provisions referred to above, now appearing in § 12, supra. See State ex rel. Moody v. Baker, 1884, 20 Fla. 616, 655; Spafford v. Brevard County, 1926, 92 Fla. 617, 110 So. 451, 457.
It has long been settled in this jurisdiction, however, that the prohibition against the taking of private property "without just compensation" contained in § 12, supra, is not limited to the taking of property under the right of eminent domain. State ex rel. Davis v. City of Stuart, 1929, 97 Fla. 69, 120 So. 335, 348, 64 A.L.R. 1307. Thus, this provision has been applied to hold invalid an order of the railroad commission reducing the rates of a railroad company to such an extent that the railroad company could not pay the expenses of operation, Pensacola & A.R. Co. v. State, 1889, 25 Fla. 310, 5 So. 833, 3 L.R.A. 661; to hold invalid a municipal ordinance fixing water rates at a level that reduced the company's gross receipts below its reasonable *406 costs and operating expenses, Village of Virginia Gardens v. Haven Water Co., Fla. 1956, 91 So.2d 181; to hold invalid a Special Act extending municipal boundaries to include rural lands, State ex rel. Davis v. City of Stuart, supra, 120 So. 335; to require a city to compensate the owner of oyster beds for damage to such beds caused by the City's dumping sewage into the river, Gibson v. City of Tampa, 1938, 135 Fla. 637, 185 So. 319; to hold invalid zoning ordinances in their application to a particular property, Dowling v. State, Fla. 1955, 82 So.2d 519; Ex parte Wise, 141 Fla. 222, 192 So. 872, and to hold invalid an ordinance forbidding bathing in a privately owned lake from which the city water is drawn, Pounds v. Darling, 75 Fla. 125, 77 So. 666, L.R.A. 1918E, 949. And while not expressly so stated, it is clearly implied in our opinion in Corneal v. State Plant Board, supra, 95 So.2d 1, that the Board's compulsory program of pull and treat, as therein discussed, was also violative of the mandate of § 12, supra, prohibiting the taking of private property without just compensation.
In considering whether the act in question violates the concept of just compensation commanded by § 12, supra, it should be noted that the Legislature made specific provision for the payment of "reasonable compensation not to exceed one thousand dollars per acre" for the destruction of uninfested trees and required the Board to consider the several factors specified in the Act, "and other reasonable factors having a bearing on just and fair compensation," in determining the amount of compensation to be paid the individual grower. It might also be noted, parenthetically, that the Act provided that no compensation should be made for the destruction of infested trees, as distinguished from trees that, although infested with burrowing nematodes, have not yet begun to "decline" and thus are, presumably, still commercially profitable. This provision was also attacked in the plaintiffs' complaint, coupled with an allegation that, of the 41 trees found by the Board's agents to be infested with burrowing nematodes, only three showed any signs of decline. The Chancellor did not rule on this issue except by indirection. His order struck down all these provisions, in toto, on the theory that grove owners were entitled to "full compensation", represented by the "fair market value" of the "healthy" trees destroyed, alleged in the complaint (and admitted, for the purpose of the motion, by the Board's motion to dismiss) to be $40 each, and for which the Board proposed to pay the plaintiffs a total of $206.54 as compensation for the destruction of 165 uninfested trees.
But we are not here concerned with the adequacy of the compensation proposed to be paid to plaintiffs, since this issue has not yet been ruled upon by the Chancellor. On this interlocutory appeal from the order denying the Board's motion to dismiss, we are concerned only with the validity of the Act in its application to all citrus growers and, at this point, with the question of whether the Act complies with the requirement of § 12, supra, that "just compensation" be paid to citrus growers such as plaintiffs. The Act requires the Board to pay "just and fair" compensation to such citrus growers, and we do not see how the Legislature could have done more. "Just compensation" for the destruction of a citrus tree in a grove infested with burrowing nematodes is not the equivalent, as it cannot be, of the "fair market value" of a citrus grove in which no infestation has been found. And insofar as the order here reviewed held that the grove owner is entitled to "full compensation" equal to the "fair market value" of each healthy tree destroyed, it must be held to be in error.
We agree with the Chancellor, however, that the Legislature was not justified in fixing the maximum amount of compensation that could be paid. When, in the exercise of the police power, the State through its agents destroys diseased *407 cattle, unwholesome meats, decayed fruit or fish, infected clothing, obscene books or pictures, or buildings in the path of a conflagration, it is clear that the constitutional requirement of "just compensation" does not compel the State to reimburse the owner whose property is destroyed. Such property is incapable of any lawful use, it is of no value, and it is a source of public danger. A legislative provision for compensation in such cases is a mere bounty that may, of course, be fixed at whatever level the Legislature desires. Cf. Campoamor v. State Live Stock Sanitary Board, 1938, 136 Fla. 451, 182 So. 277.
But where, as here, a provision for "just compensation" is a clear requisite to the act of destruction, then we find no authority for the Legislature's specification of the maximum compensation to be paid.
Art. 2 of our constitution provides for the distribution of powers among the legislative, executive and judicial branches of our government and states that "no person properly belonging to one of the departments shall exercise any powers appertaining to either of the others, except in cases expressly provided for by this Constitution." It is settled in this state that "the determination of what is just compensation for private property that is taken for public use is a judicial function that cannot be performed by the Legislature either directly or by any method of indirection." Spafford v. Brevard County, supra, 110 So. 451, 454. While this was a case involving the taking of property under the power of eminent domain, it is equally applicable to the legislative encroachment upon the powers of the judiciary attempted here in the taking of property under the police power.
We next consider the question of whether the Chancellor erred in holding the Act invalid insofar as it authorized the destruction of a grove owner's healthy trees "before compensation shall be paid or secured to" the owner. Here, again, the Chancellor is using the language of § 29 of Art. 16, prohibiting the taking of property by eminent domain proceedings "until full compensation therefor shall be first made to the owner, or first secured to him by deposit of money; * * *" But the analogous question under the due process clause of § 12, supra, is whether the owner should have been given the opportunity to have an administrative determination by the Board, and a judicial review of such administrative determination, of the amount of compensation he should receive, prior to the destruction of his healthy trees. In other words, does a summary destruction of an owner's trees followed by an administrative and judicial hearing on the question of the amount of compensation to be paid to him, comport with "due process"? An allied question, contended for in the lower court and here argued by the plaintiffs-appellees, is whether summary destruction of his trees without giving him an opportunity to be heard either administratively or judicially on the question of the propriety or reasonableness of the action by the Board's agents, is a denial of due process.
Due process of law is not an exact concept. Generally speaking, it "implies conformity with the natural and inherent principles of justice for the protection of individual rights, forbids the taking of one's property without compensation, and requires that no one be condemned in person or property without opportunity to be heard." Louis K. Liggett Co. v. Amos, 1932, 104 Fla. 609, 141 So. 153, 156. The opportunity to be heard "must be full and fair, not merely colorable or illusive." Ryan's Furniture Exchange, Inc. v. McNair, 1935, 120 Fla. 109, 162 So. 483, 487. Accord: Redman v. Kyle, 1919, 76 Fla. 79, 80 So. 300.
It is well settled, however, that the concept of due process does not necessarily require the granting of a hearing prior to the taking of official action in the exercise of the police power. Where a compelling public interest justifies the action, *408 the Legislature may authorize summary action subject to later judicial review of the validity thereof. See Yakus v. United States, 1944, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834, often cited in cases involving "due process." Thus, it has long been established that in the exercise of its police power the state may summarily seize or destroy diseased cattle, contaminated food, obscene publications, illicit intoxicants, narcotics, prohibited weapons, gambling devices and paraphernalia, and other property that menaces the public health, safety or morals. The seizure of such goods is justified because the danger exists that the property deemed malefic will be distributed to the public to its injury, or used for an illegal purpose, absent a seizure and pending a proceeding to determine the propriety of the seizure. Cf. Metallic Flowers v. City of New York, 1957, 4 A.D.2d 292, 164 N.Y.S.2d 227.
It is obvious that no such danger exists in the situation here. The citrus disease here involved  spreading decline caused by a burrowing nematode  is not carried by the wind or by insects from grove to grove; "the burrowing nematode causing the disease travels underground from one tree to another at an average rate throughout the state of 1.6 trees, or 36 feet, per year." Corneal v. State Plant Board, supra, 95 So.2d 1, 2. The fruit borne by the healthy trees, even though the tree may have some infestation, is no different from that on the uninfested trees. The only possible reason for the summary destruction of the healthy trees would be the imminent danger of the spread of the disease from an infested to a non-infested grove. Since the facts developed in the Corneal case, and alleged in the complaint in the instant case, show that there is no such danger, we cannot find a "compelling public interest" sufficient to justify making an exception to the basic and fundamental rule of due process, requiring notice and a hearing before depriving a person of a substantial right. This is particularly true in view of the fact that we can find no justification for the legislative declaration that "No compensation shall be made by the board for the destruction of trees which are infested by the burrowing nematode at the time of their destruction." As noted above, the question of what is "just compensation" must be finally determined by the judiciary, unless the grove owner is satisfied by the amount offered by the Board's agent. And, as previously stated, an infested tree may be healthy, in the sense that it has not yet begun to decline, and still commercially profitable. A court might wish to consider the profits expected from such productive, although infected, tree in determining "just compensation." And it is apparent that an X-mark on a map, showing an infested tree destroyed under the Board's pull and treat program, and the testimony of the parties as to the condition of the tree, would not be the best evidence of the condition of the tree. Thus, in addition to the fact that the statutory provision quoted immediately above is an invasion of the province of the judiciary, it might also deny to the grower a hearing that is "full and fair, not merely colorable or illusive." Ryan's Furniture Exchange, Inc. v. McNair, supra, 162 So. 483.
In summary, the Chancellor was correct in holding invalid those portions of the Act and the Rules of the Board placing a ceiling of $1,000 on the compensation to be paid to the grove owner and authorizing summary destruction of the owner's citrus trees prior to a hearing on the adequacy of compensation proposed to be paid to him. The owner is also entitled to an opportunity to be heard on the propriety or "reasonableness" of the administrative action of the Board's agents insofar as the program of pull and treat proposed for his grove is concerned, prior to the destruction of his citrus trees under such program. See Bailey v. Van Pelt, 1919, 78 Fla. 337, 353, 82 So. 789. We also agree with the Chancellor's indirect holding that the provision denying compensation for infested trees, without regard to whether they are still productive and not yet "declined", is unlawful. We *409 do not agree with his conclusion that "full compensation" measured by the fair market value of the trees must be paid to the owner.
It follows, therefore, that the Board's compulsory program of pull and treat cannot be summarily carried out in any grove, either as to infested or uninfested trees, without giving the grove owner an opportunity to be heard on the questions of the propriety of the action of the Board's agents and the adequacy of the compensation proposed by such agents to be paid to him. This is so because, even if the infested trees were subject to summary destruction as a legislatively declared nuisance, they could not be destroyed except as a part of the Board's over-all program of pull and treat, involving the destruction of infested and non-infested trees and fumigation of the cleared area, since destruction of the infested trees alone would be ineffective to control the disease, see Corneal v. State Plant Board, supra, 95 So.2d 1, and thus would not serve a public purpose.
It would seem that the invalid provisions of the statute could be deleted without doing violence to the primary legislative intention to provide for a compulsory program for the containment and eradication of spreading decline. The Act itself declared its intent that "if any section, subsection, sentence, clause or provision of this act be held invalid the remainder of the act shall not be affected." § 6, Ch. 57-365, Laws of 1957.
Accordingly, we hold that the phrase "not to exceed $1,000.00 per acre" in the third paragraph of § 2 of the Act, and the sixth paragraph of § 2, prohibiting the payment of compensation for infested trees, are invalid and of no effect; and that, insofar as the Act may be interpreted as authorizing the summary destruction of citrus trees without an opportunity to be heard prior to such destruction, it is invalid, as are the Board's Rules so interpreting it. The remainder of the Act is valid and effective.
The order here reviewed is affirmed in part and reversed in part and the cause remanded for further proceedings consistent herewith.
TERRELL, C.J., and THOMAS, DREW and THORNAL, JJ., concur.