568 So.2d 35 (1990)
DEPARTMENT OF AGRICULTURE AND CONSUMER SERVICES, Appellants/Cross-Appellees,
v.
Richard O. POLK, etc., Appellee/Cross-Appellant.
No. 73842.
Supreme Court of Florida.
September 27, 1990.
*37 Robert A. Butterworth, Atty. Gen., Beverly S. McLear, Asst. Atty. Gen., Tallahassee, Parker Thomson of Thomson, Muraro, Bohrer and Razook, P.A., Sp. Asst. Atty. Gen., Miami, and Mallory Horne, Gen. Counsel, Dept. of Agriculture and Consumer Services, Tallahassee, for appellants/cross-appellees.
J. Davis Connor of Peterson, Myers, Craig, Crews, Brandon & Mann, P.A., Lake Wales, and Douglas A. Lockwood, III, Winter Haven, for appellee/cross-appellant.
M. Stephen Turner and David K. Miller of Broad and Cassel, Tallahassee, amicus curiae for Mid-Florida Growers, Inc. and Himrod and Himrod Citrus Nursery.
EHRLICH, Justice.
We have on appeal a case which the Second District Court of Appeal certified as being of great public importance and requiring immediate resolution by this Court. We have jurisdiction. Art. V, § 3(b)(5), Fla. Const.
In September 1984, a bacterial disease was discovered by the Florida Department of Agriculture and Consumer Services (Department) in Ward's Citrus Nursery in Polk County. On September 10, 1985, lesions similar to those found at Ward's nursery were found on the leaves of newly budded citrus trees in Block E of the Richard Polk Nursery (Polk). Polk is a field nursery which engages in the business of selling mature budded trees. The nursery buys seedlings from outside sources and plants (lines) them in the field. After approximately five to six months, the liners are budded (budwood is grafted onto the liner). Approximately twelve months after budding, the tree is "mature" and can be sold to growers. Upon discovery of the lesions, the nursery stock of Polk Nursery was ordered destroyed. Thereafter, the Department *38 destroyed all of the 510,059 citrus nursery trees at the nursery.[1] Of those destroyed, ten or fewer of the trees had shown any symptoms of bacterial disease.
Richard Polk filed suit against the state of Florida and the Department alleging that the September 1985 destruction of the citrus nursery stock constituted a taking for which he was entitled to compensation under both the Florida and the United States Constitutions. The trial was bifurcated. The liability issue was tried to the court. In its final judgment, the trial court rejected the Department's contention that Polk's complaint alleged a tort by the state which is governed by the provisions of section 768.28, Florida Statutes (1985). The trial court viewed the action as an inverse condemnation claim to which section 768.28 is inapplicable, rather than a tort claim.
On the issue of whether or not the Department's action was a taking which required full and just compensation, the trial court ruled that the regulation, as applied in the instant case, was arbitrary and capricious; that the action failed to promote public health, safety, or welfare; and that no public harm was actually prevented by the destruction. The court determined that such an action constituted an unconstitutional taking. The trial court then noted that the trees actually diseased, and those trees within 125 feet of the diseased trees, had no marketable value and ruled that Polk need not be compensated for those trees. Based on the above, the trial court declined to reach Polk's argument that the Department's action "violated Plaintiff's right to due process guaranteed by the Fourteenth Amendment to the United States Constitution... ."
A jury trial was held to determine the compensation due Polk Nursery pursuant to the court's final judgment on liability. Subsequent to the presentation of Polk's case, the Department proffered testimony which the trial court had ruled was inadmissible during the pretrial conference. The trial court again ruled the evidence inadmissible and the Department rested without presenting any further evidence or testimony. The trial court granted a partial directed verdict in favor of Polk Nursery in the amount of $1,613,214.00 for the nursery's mature budded trees, immature budded trees, and potted nursery trees. The remaining damages issues were submitted to the jury, which reached a verdict in favor of Polk Nursery in the sum of $1,045,834.00. Final judgment for Polk Nursery's combined damages, plus interest, was rendered in the total sum of $3,003,455.30. The Department's motion for new trial was denied. The Department appealed to the Second District Court of Appeal and Polk filed a cross appeal. The district court certified the case to this Court as being of great public importance and requiring immediate resolution by this Court.

LIABILITY TRIAL
The Department first argues that Polk improperly challenged the propriety of the agency action in an inverse condemnation proceeding. The Department also contends that the trial court determined that the burning of Polk's trees was erroneous and not a proper exercise of the police power and, because of this determination, Polk's remedy is a tort action for negligent destruction rather than an inverse condemnation suit.
The Department correctly notes that the propriety of an agency's action may not be challenged in an inverse condemnation proceeding. § 253.763(2), Fla. Stat. (1985); Department of Agric. & Consumer Servs. v. Mid-Florida Growers, Inc., 521 So.2d 101, 103 n. 1 (Fla.), cert. denied, 488 U.S. 870, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988). A review of the record, however, reveals that Polk did not challenge the validity of the Department's statutory authority. Further, Polk neither challenged the validity of the Department's rule nor alleged that the Department failed to comply with or properly implement the *39 rule. Compare Albrecht v. State, 444 So.2d 8 (Fla. 1984) (where first action constituted a challenge to the propriety of the agency's actions).
In Corneal v. State Plant Board, 95 So.2d 1, 4 (Fla. 1957), this Court stated:
In enacting regulatory measures which protect but do not destroy property, the law need not restrict itself to conditions actually harmful but may require precautions within the whole range of possible danger. But the absolute destruction of property is an extreme exercise of the police power and is justified only within the narrowest limits of actual necessity, unless the state chooses to pay compensation.
(Citations omitted.) In the present case, the evidence and argument presented at the liability phase were properly related to the issue of whether the bacterial disease constituted a nuisance or presented an imminent public danger so that destruction without payment of just compensation was permissible or whether, under the circumstances, the destruction of the nursery stock was a taking of property for which full and just compensation was due.
We also reject the Department's argument that the trial judge determined that the destruction in the present case was an invalid exercise of the state's police power, with the result that Polk's remedy is an action in tort rather than inverse condemnation. This Court has recognized on numerous occasions that "it is a settled proposition that a regulation or statute may meet the standards necessary for exercise of the police power but still result in a taking." Mid-Florida Growers, 521 So.2d at 103; Albrecht, 444 So.2d at 12; Graham v. Estuary Properties, Inc., 399 So.2d 1374, 1381 (Fla.), cert. denied, 454 U.S. 1083, 102 S.Ct. 640, 70 L.Ed.2d 618 (1981). As noted above, the evidence and argument presented were properly limited to whether the actions of the Department constituted a taking requiring full and just compensation. The issue of the validity of the action under the police power was not raised.[2]
*40 The Department next contends that the destruction of the nursery stock was reasonable and the trial court's contrary conclusion was against the manifest weight of the evidence and must be reversed.[3] In a cross appeal, Polk argues the trial judge erred in ruling that the state was not liable for compensation for those trees located within 125 feet of the trees actually diseased. Each of the parties adduced the testimony of many witnesses regarding the necessity of destruction of the nursery stock. As we noted in Mid-Florida Growers, however, "the trial judge in an inverse condemnation suit is the trier of all issues, legal and factual, except for the question of what amount constitutes just compensation. The trial court's determination of liability in an inverse condemnation suit is presumed correct and its findings will not be disturbed on appeal if supported by competent, substantial evidence." 521 So.2d at 104 (citations omitted). We conclude, based upon a review of the record, that there was substantial competent evidence presented at the liability phase to support the trial court's finding that Polk was entitled to compensation for all nursery stock destroyed except for those trees exhibiting symptoms of the bacterial disease and those located within 125 feet.[4] Accordingly, we affirm the trial court's determination of liability and reject Polk's cross appeal.

DAMAGES
Turning to the jury trial on damages, we first address the Department's argument that the trial court erred in excluding certain evidence. Polk filed a motion in limine requesting that the trial court prohibit the Department from introducing evidence that the trees in Polk's nursery had a diminished market value due to perception in the citrus industry that the bacterial disease found in the nursery was a dangerous disease. At the pretrial conference *41 held on May 5, 1988, the Department argued that testimony by persons who are in the business of buying nursery stock that they would not have purchased from Polk because of the presence of a disease during this period of time was relevant to the value of the property destroyed. The trial court ruled that the "State shall not be allowed to introduce any evidence that the market value of Plaintiff's citrus nursery trees was affected by the presence of a bacterial disease in his nursery without first laying a predicate that the bacterial disease detected at Plaintiff's nursery was a dangerous disease."
Subsequent to the presentation of Polk's case during the jury trial, the Department submitted two witness proffers which asserted that the two witnesses were officers of companies in the businesses of operating citrus groves and/or shipping fresh fruit. The proffers further stated that these witnesses would have testified that from the first news of an outbreak of a citrus disease during late 1984, they began exercising extreme caution in selecting citrus plants for use in groves and they would not have purchased any citrus plants from Polk Nursery subsequent to detection of a citrus disease anywhere within the confines of the nursery.
The Department argues that the trial court, in effect, erroneously ruled that evidence of "public fear" of plants from an infected nursery such as Polk's is inadmissible unless the state establishes that the "fear" is reasonable. We agree. In Florida Power & Light Co. v. Jennings, 518 So.2d 895 (Fla. 1987), the First District Court of Appeal certified the following question: "Is evidence of the existence of fear and its effect on market value admissible as a factor in property valuation, if it is shown that the fear is reasonable." Id. at 895. In answer to the question, this Court held
that all evidence relevant to the issue of full compensation is admissible in eminent domain proceedings. The public's "fear" as a factor which may be relevant to the issue of just compensation may be utilized as a basis for an expert's valuation opinion regardless of whether this fear is objectively reasonable.
Id. Jennings involved admissibility of expert evidence that potential buyers had a fear of proximity to high power transmission lines and would therefore pay less for property on which Florida Power and Light had a perpetual utility easement for these lines.
We conclude that the analysis in Jennings is equally applicable in the present situation. In Department of Transportation v. Nalven, 455 So.2d 301, 307 (Fla. 1984), this Court stated that "[t]he constitutional requirement of full compensation means that the landowner must be completely paid for that which is taken, and compensated for the whole loss occasioned by the taking. In most cases it will be necessary and sufficient to full compensation that the award constitute the fair market value of the property." (Citations omitted.) Fair market value is generally defined as what a willing buyer would pay to a willing seller, neither party being obligated to act. See United States v. Virginia Elec. & Power Co., 365 U.S. 624, 81 S.Ct. 784, 5 L.Ed.2d 838 (1961). Inherent in the concept of a willing buyer and a willing seller is that both buyer and seller are aware of all relevant facts regarding the property at issue. Testimony from members of the citrus industry to which Polk sought to sell his inventory that they would not have purchased nursery stock from a nursery at which a bacterial disease had been discovered would be especially relevant in determining what amount constitutes just compensation for the property taken. The trial court erred in excluding this evidence.
Polk contends that to permit the introduction of the evidence at issue would allow the Department to unilaterally reduce the value of the property by its regulatory declarations concerning the property. In support of its argument, Polk relies on State Road Department v. Chicone, 158 So.2d 753 (Fla. 1963), and Dade County v. Still, 377 So.2d 689 (Fla. 1979). Polk's reliance upon these decisions is misplaced. In Chicone and Still, announcements were *42 made of the parcels to be condemned in advance of institution of condemnation proceedings. This Court held that evidence of depression or depreciation in value due to the prospect of condemnation may not be admitted; a condemning authority cannot benefit from a depression in property value caused by a prior announcement that it will be taken for a public project. In contrast to the situation in Chicone and Still, it appears that any decrease in value reflected in the proffered testimony would be due to the presence of a disease, a cause independent of the condemning authority. The Department was not responsible for the presence of the disease at the nursery. Accordingly, we reverse the judgment awarding damages.
The Department also contends Polk was improperly permitted to argue to the jury that the proper measure of damages for liners and for immature budded plants was the market value such nursery stock would have had at the time it would have reached maturity less the costs which would have been incurred in bringing them to maturity. Generally, the "just and full compensation" due is the fair market value of the property at the time of the taking. See First English Evangelical Lutheran Church v. County of Los Angeles, 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987). This Court has also recognized, however, that "[a]lthough fair market value is an important element in the compensation formula, it is not an exclusive standard in this jurisdiction. Fair market value is merely a tool to assist us in determining what is full or just compensation, within the purview of our constitutional requirement." Jacksonville Expressway Auth. v. Henry G. DuPree Co., 108 So.2d 289, 291 (Fla. 1958). See also Dade County v. General Water-works Corp., 267 So.2d 633, 639 (Fla. 1972) ("The conclusion to be drawn is simply that the proper valuation method or methods for any given case are inextricably bound up with the particular circumstances of the case."). The question presented here is what valuation method or methods may properly be considered by the jury in determining full compensation when the property taken is a growing crop for which there is no market at the time of destruction because it is unmatured.
In Lee County v. T & H Associates, 395 So.2d 557 (Fla. 2d DCA 1981), the Second District Court of Appeal held that the trial court did not err in allowing evidence on the prospective net revenue of a watermelon crop located on a parcel of condemned land when the crop was only partially developed at the time of taking so that there was no market. We agree with the court in Lee County that when there is no market at the time of the taking due to the crops' partial state of development, it is necessary to consider other evidence bearing on value. We also conclude that the prospective net revenue which could have been derived from the crop at maturity is a proper measure of valuation.[5]
The Department argues that Polk's reliance upon Lee County is misplaced because Lee County and similar cases applying a future valuation analysis have been expressly limited to crops with a growing season of one year or less and that the nursery stock at issue has a growing season of eighteen months. We reject the Department's argument that this valuation method may not be applied in this case because the nursery stock had a growing period of eighteen months. This argument is based upon the following language from Lee County:
Since the melons had a growing period of no more than one year,[2] we believe that the court did not err in allowing evidence on the prospective net revenue.
[2] In the case of plants with a growing life in excess of a year, such as trees grown for commercial cutting, the rule may be entirely different.
395 So.2d at 560. It appears that this analysis was based upon the court's concern that consideration of prospective net *43 revenues would, at some point in time, entail consideration of too many intangibles. However, as the district court noted, "[i]n each case, the trial court always retains the discretion to decide whether the proffered evidence is sufficiently reliable to be admitted for jury consideration." Id. at n. 3. The determination of when the maturity date is so far in the future as to become too speculative must be determined on a case-by-case basis; we decline to adopt a particular point in time after which this valuation method may not be applied.
In the present case, although the liners had a growing period of approximately eighteen months, it appears that the liners and immature budded plants would have matured and been ready for sale approximately twelve months subsequent to their destruction. Moreover, the maturity date had passed before trial, thereby eliminating speculation as to the price mature budded plants were bringing in the market at the time the destroyed plants would have been ready for sale.[6] The trial court did not abuse its discretion in allowing consideration of evidence of prospective net revenues with regard to liners and immature budded plants in the present case.[7]
The Department also challenges the award of damages for "lost production." Polk asserted that subsequent to the destruction of the nursery stock, the nursery was quarantined and prohibited from producing citrus plants for one year. During the pretrial conference preceding the trial on damages, Polk contended he was "entitled to full measure of loss of profits" and that this would include loss of profits incurred due to the loss of production time during the period the nursery was "quarantined." The trial court rejected the Department's argument that such damages were not recoverable. At the close of the trial on damages, this issue was submitted to the jury, which returned a verdict in favor of Polk in the amount of $1,285,543.60 for the asserted damages due to "lost production."
We agree with the Department's contention that the award of damages based on Polk's "loss of production" theory was erroneous. Polk's amended complaint alleges only that the destruction of the citrus nursery stock constituted a taking without compensation. In the final judgment issued by the trial court on liability, the trial court only orders that the Department shall pay Polk "for all trees burned with the exception of those trees actually diseased and those trees located within one-hundred and twenty-five feet (125 ft) of them." During the liability phase the trial court made no finding of a partial taking of the land that would have precluded Polk from replanting or restocking his nursery for a period of time subsequent to the destruction of his existing nursery stock. It, therefore, was not properly considered during the damages phase.
In conclusion, we affirm the trial court's determination that the destruction of the trees actually exhibiting physical symptoms of the bacterial disease and those within 125 feet of those trees did not constitute a taking, but that Polk is entitled to compensation for the remainder of the destroyed nursery stock. We remand to the district court, however, with directions to remand to the trial court for proceedings pursuant to chapter 89-91, Laws of Florida, and this Court's decision in Department of Agriculture & Consumer Services v. Bonanno, 568 So.2d 24 (Fla. 1990).
It is so ordered.
*44 SHAW, C.J., concurs.
McDONALD, J., concurs specially with an opinion, in which
OVERTON, J., concurs.
BARKETT, J., concurs specially with an opinion.
GRIMES, J., concurs with an opinion.
KOGAN, J., concurs in part and dissents in part with an opinion.
McDONALD, Justice, concurring specially.
The judgment entered for Polk must be vacated. All relevant market factors in existence on the day of the taking should be considered, but this was not allowed in the trial. Polk is entitled only to the fair market value of his plants when taken. Staninger v. Jacksonville Expressway Authority, 182 So.2d 483 (Fla. 1st DCA 1966). In a normal condemnation proceeding fair market value is defined as what a willing buyer would pay and what a willing seller would accept for the property, neither acting under constraints or duress and both being fully informed. Id. Any buyer of plants is interested in the health of the plants he intends to purchase and the health and integrity of the source from which they come. Polk's nursery contained canker-infected plants. At the time of the taking this infection was thought to be malignant and contagious. These factors would have a severe impact on what a willing buyer would pay.[8] The state should not have to compensate Polk for more than what a fully informed buyer would have paid for Polk's plants at the time they were taken and based on knowledge that existed then.
I still have difficulty in finding a legal liability for any amount, although this Court seemingly answered that question in the case of Department of Agriculture & Consumer Services v. Mid-Florida Growers, Inc., 521 So.2d 101 (Fla.), cert. denied, 488 U.S. 870, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988). In that case I contended that if the state acted in good faith in exercising its police power it should not have to pay damages in the form of inverse condemnation. The majority ruled, however, that "full and just compensation is required when the state, pursuant to its police power, destroys healthy trees." Id. at 105.
To support its holding, the majority in Mid-Florida relied upon Corneal v. State Plant Board, 95 So.2d 1 (Fla. 1957), and State Plant Board v. Smith, 110 So.2d 401 (Fla. 1959). These cases, however, are factually distinguishable from the case at bar. Both Corneal and Smith involved the state's efforts to combat "spreading decline," a disease which caused citrus trees to gradually decline and eventually become commercially unprofitable. Herein lies the distinction. Spreading decline is caused by the burrowing nematode, which travels underground from one tree to another at the average rate of 1.6 trees or 36 feet per year. Citrus canker is a bacteria, which can spread rapidly, and can be transmitted by wind, water, tree clippings, fruit, or even the clothing of workers or field inspectors. It is important to note that this Court in both Corneal and Smith, in holding that the state must pay compensation for destroying healthy trees, did so by taking into account that the disease caused by the nematode spread slowly. In Corneal this Court held that the state must compensate for destroying healthy trees because, due to the fact that the disease spread slowly, the healthy trees offered no immediate menace to trees in a neighboring grove. This Court stated further that no case could be found holding that a healthy plant, not imminently dangerous, could be destroyed without compensation. In Smith this Court held that the state must pay compensation for destroying healthy trees because "[t]he citrus disease here involved  spreading decline caused by a burrowing nematode  is not carried by the wind or by insects from grove to grove," but rather is a disease which spreads slowly. 110 So.2d at 408 (emphasis added).
*45 Due to the fact that scientists have observed that citrus canker, whether Asian canker or the Florida Nursery strain, is capable of spreading rapidly, and may remain dormant on trees and therefore show no outward signs of disease, I would hold that the facts of this case fit exactly into the "exception" noted by this Court in both Corneal and Smith, i.e., healthy trees may be imminently dangerous and, therefore, may be destroyed without compensation to prevent the spread of the disease to an uninfested grove. I believe that this Court has placed too much emphasis on whether the state destroys healthy or diseased trees in determining whether the state owes compensation to the deprived owner. The bottom line of my argument is that just because a tree is found to be healthy should not be determinative of the constitutionality of the taking.
In this case the commissioner acted responsibly. He relied on the best experts available who, at that time and based on what they knew, felt that the destruction of Polk's plants was required.[9] Their opinion was shared by agents of the United States Department of Agriculture (USDA) and was not contested by Polk.
We should review the scenario leading up to the destruction of Polk's plants. In September 1984 field inspectors for the department discovered a bacterial plant disease in Ward's Citrus Nursery. Within days the department sent samples of the bacteria to the USDA for analysis. The USDA identified the bacteria causing the disease as xanthomonas campestris pv. citri. At that time this was the scientific name for the bacteria that causes Asian citrus canker, a disease which nearly devastated Florida's citrus industry around 1915. Later that same month, the USDA declared an emergency because of the potential severity of the disease. Representatives of the Florida citrus industry immediately demanded that the department take action to ensure that the disease would not infest other groves. Other states such as Texas and California, as well as foreign countries, also became alarmed and requested that steps be taken to prevent any further spread of the disease. In October 1984 the USDA declared the Florida citrus canker outbreak an extraordinary emergency and, in conjunction with the department, began taking steps to eradicate the disease to prevent it from spreading.
The Florida Legislature, beginning at a special session in December 1984, also responded to the threat of citrus canker by enacting section 581.184, Florida Statutes (Supp. 1986), which provided specific authority to the Commissioner of Agriculture to destroy plants carrying the disease. In March 1985 the department adopted chapter 5B-49 as part of the Florida Administrative Code, declaring citrus canker disease caused by xanthomonas campestris pv. citri a plant pest and a nuisance and authorizing quarantines, destruction of trees, and treatment of citrus to prevent an epidemic.
Almost immediately after the discovery of citrus canker, scientists began conducting extensive research to determine the exact nature of the canker discovered at Ward's Nursery. After preliminary analysis, scientists were unsure how similar this disease was to Asian citrus canker. They knew that xanthomonas campestris pv. citri included many bacterial strains, and they knew not all of those bacteria caused Asian citrus canker. Although similar in symptomatology, scientists observed that the reaction of citrus trees exposed to this *46 bacterium was not what had been described as the typical reaction of citrus to Asian canker. The question was, just how different was this bacterium and was its effect on citrus as potentially devastating as the Asian canker.
In addition to research into the exact type of canker infesting Florida's nurseries, scientists began conducting research on an effective means of controlling and preventing the spread of the Asian canker itself. Scientists researching infested citrus groves in Argentina determined that the Asian canker might not be as severe a threat as they had previously thought. In fact, Argentina seemed to be rather successful in controlling the disease with a properly timed copper-sulfate spray program. Scientists were still unsure, however, as to whether the citrus canker discovered in Florida's nurseries was actually the Asian canker or some other variation of xanthomonas campestris. This was the situation when the canker in Polk's nursery was discovered.
Only recently have scientists been able to state with certainty that the canker discovered in Florida is not Asian canker, but rather a distinct form of canker which scientists now identify as the Florida Nursery strain of xanthomonas campestris. Further analysis also now indicates that there are various types of the Florida Nursery strain, both aggressive and nonaggressive. In addition, scientists now know that the canker discovered in Polk's nursery was a nonaggressive type and that destruction of the entire nursery of 510,059 trees due to the infestation of approximately ten trees was excessive and unnecessary. When Polk's nursery was destroyed, information gathered by scientists was moving towards an understanding of the distinct characteristics of the Florida Nursery strain, but the experts still felt destruction necessary. Three months later the department obtained enough information to modify the eradication procedures then in effect and adopted a risk assessment system under which the department probably would not have destroyed Polk's entire nursery stock.[10] Just when scientists and the department were certain that canker was not a severe threat to the citrus industry at the time it was discovered at Polk's nursery remains uncertain, but clearly came after Polk's loss.[11]
In hindsight, it may be that the department overreacted and confiscated property unnecessarily, but a review of its action should not be made on hindsight. Mid-Florida Growers, 521 So.2d at 106. The department had a duty to take emergency measures to prevent what it and others perceived as an immediate harm. In viewing its action from an emergency standpoint, and considering the uncertainty concerning the exact nature of the disease, that action was reasonable. Moreover, any doubt as to whether the disease was actually dangerous at the time of the department's actions should be resolved in favor of the department. Absent a clear showing of invalidity of the enabling statutes or an arbitrary, unreasonable administration of the program, courts should not interfere. Conner v. Carlton, 223 So.2d 324 (Fla.), appeal dismissed, 396 U.S. 272, 90 S.Ct. 481, 24 L.Ed.2d 417 (1969).
The majority's holding in this case, in effect, places the department in a no win situation. If, as in the case at bar, the department takes action to eradicate a disease thought by itself and the USDA to be potentially devastating, and scientific research subsequent to that action later indicates that such action was unnecessary, the majority would uphold a trial court's finding that the action was unconstitutional and require the state to pay compensation. On the other hand, if the department, relying on research that the disease might not be a serious threat to the citrus industry, *47 takes no action and the disease later spreads and causes damage to other citrus groves, such inaction could amount to an unconstitutional taking and require compensation to those owners of citrus groves damaged by the uncontrolled spread of the disease. See South Florida Growers Association, Inc. v. United States Department of Agriculture, 554 F. Supp. 633 (S.D. Fla. 1982). See also St. Michael's Convalescent Hospital v. California, 643 F.2d 1369 (9th Cir.1981); Wearly v. Federal Trade Commission, 462 F. Supp. 589 (D.N.J. 1978) (Failure to provide adequate protection when property is placed in jeopardy by governmental action can amount to an unconstitutional "taking" of property by destroying it or by exposing it to the risk of destruction.), vacated on other grounds, 616 F.2d 662 (3d Cir.), cert. denied, 449 U.S. 822, 101 S.Ct. 81, 66 L.Ed.2d 25 (1980). Moreover, such inaction by the department could possibly cause irreparable damage to Florida's citrus industry, a risk which the state simply cannot afford to take.
In conclusion I would hold that the department took its action in good faith, that its action was reasonable in light of the situation and scientific information known at the time, and that there should be no legal liability for its action. That is not to say, however, that the state has no moral responsibility to those who have suffered losses because of the eradication program. Indeed, such a responsibility is strong in these cases. The legislature has now recognized that the nursery owners should not have to bear the full brunt of their losses and has enacted remedial legislation.[12] The rights afforded under this legislation should be Polk's exclusive avenue for relief. But for the statute I also believe the state would be entitled to a new trial on the taking issue.
It is important to note that the trial court and the majority both recognize that a review of state action taken pursuant to its police power should be limited to the information available at the time the state took such action. A review of the trial record, however, reveals that the trial court admitted into evidence testimony regarding scientific information discovered only after the department decided to destroy Polk's trees. This, by itself, should constitute reversible error because any information which became available only after the fact is irrelevant and prejudicial to a determination of whether such action was reasonable. The majority refuses to address this issue by pointing to the fact that the trial court expressly stated that it based its decision only upon pertinent scientific information available at the time of the department's action. I believe that the after-the-fact information was impossible to disregard and so tainted the trial judge's decision-making process that, at the very least, this case should be remanded for a new trial which excludes all after-the-fact evidence.[13] Due to the unknown exact nature of the disease at the time of the department's action, any determination of whether that action was reasonable is difficult enough. By admitting into evidence testimony that scientists later discovered that the disease was not as serious as first believed, and that the department's action was excessive and unnecessary in light of what is known today, that determination is made even more difficult. It would be interesting to see if the trial court would reach the same decision if the eradication procedures taken by the department later proved to have in fact saved Florida's citrus industry from irreparable harm.
OVERTON, J., concurs.
BARKETT, Justice, concurring specially.
I concur in the conclusion of the majority but do not analyze this case based on any distinction between the police power and the power of eminent domain.
*48 The fifth amendment to the United States Constitution provides that "private property [shall not] be taken for public use, without just compensation." Article X, section 6(a) of the Florida Constitution provides that "[n]o private property shall be taken except for a public purpose and with full compensation therefor paid to each owner... ." Neither provision qualifies the requirement to pay. Thus, the only relevant question is whether a "taking" has occurred. If there has been a "taking," compensation must be paid, regardless of the nomenclature used to describe the state's power.
In eminent domain proceedings, the state concedes a "taking." Indeed, the eminent domain procedures provide for the actual transfer of title. However, a "taking" also occurs under the police power when state regulation of private property results in a substantial deprivation of the beneficial use of the property. The test is not merely whether the state acts under the police power, but whether the regulation "goes too far" so that the deprivation of economic use or diminution of property value "reaches a certain magnitude." Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 413-15, 43 S.Ct. 158, 159-60, 67 L.Ed. 322 (1922).[14]Accord First English Evangelical Lutheran Church v. County of Los Angeles, 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987); Agins v. City of Tiburon, 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980); Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).
It is true that some courts have discussed the "taking" question in terms of the police power vis-a-vis the power of eminent domain. This distinction, in turn, depended on whether the action prevented a harm or conferred a benefit. Although this Court has applied the harm-benefit distinction to determine liability, Department of Agriculture & Consumer Services v. Mid-Florida Growers, Inc., 521 So.2d 101 (Fla.), cert. denied, 488 U.S. 870, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988); Graham v. Estuary Properties, Inc., 399 So.2d 1374 (Fla.), cert. denied, 454 U.S. 1083, 102 S.Ct. 640, 70 L.Ed.2d 618 (1981), I now believe that analysis is inappropriate in "takings" cases. Moreover, it offers little practical guidance to trial courts in ascertaining whether state action amounts to a "taking" since "harm prevention" and "benefit conferment" are simply two different ways of describing the identical act.[15] Likewise, when a person for all or most practical purposes loses his or her property, it is irrelevant whether the sovereign authority of the state to act is called a police power or a power of eminent domain.
In this case, the state destroyed over 500,000 citrus trees. The trial court found this to be an unconstitutional taking. The trial court then noted that the trees actually diseased, and those trees within 125 feet of the diseased trees, had no marketable value and ruled that Polk need not be compensated for them. I believe this is the correct way to analyze this case. The majority affirms this result but does so by saying:
[W]e affirm the trial court's determination that the destruction of the trees actually exhibiting physical symptoms of the bacterial disease and those within 125 feet of those trees did not constitute a taking, but that Polk is entitled to full *49 and just compensation for the remainder of the destroyed nursery stock.
If this means that the state need not pay for the diseased trees because the trees were diseased and therefore had no value, I agree. If it means that a "taking" can never occur as a result of a valid exercise of the police power, I respectfully disagree.
GRIMES, Justice, concurring.
My review of the record convinces me that the Department of Agriculture did not act arbitrarily or capriciously in ordering the destruction of Polk's trees. In fact, I share Justice McDonald's view that this was a reasonable course of action based upon the then-existing knowledge of the experts in the industry. It was only later determined that the threat from this form of canker had been overestimated.
Notwithstanding, I join in the majority opinion because I believe that the state should not be able to destroy a person's uncontaminated property in order to protect the economic interests of a larger group without the payment of just compensation.
KOGAN, Justice, concurring in part, dissenting in part.
I am in basic agreement with the majority opinion. However, I would remand this case to the trial court for a new jury trial to determine the amount of damages because I agree with the reasoning set forth in the opinion of Justice Ehrlich in Department of Agriculture & Consumer Services v. Bonanno, No. 74,373, 568 So.2d 24 (Fla. Sept. 27, 1990) (Ehrlich, J., concurring in part, dissenting in part).
NOTES
[1] The trees were destroyed pursuant to Emergency Rule 5B-49, Florida Administrative Code, in effect during September 1985.
[2] The trial court's conclusion that "the regulation as applied in the instant case was arbitrary and capricious" would, at first glance, appear to support the Department's argument that the trial court improperly determined that the destruction of Polk's nursery stock was an invalid exercise of the police power. A closer examination of the trial court's final judgment, however, conclusively demonstrates that was not in fact what was done. The trial court began its analysis of whether the destruction at issue constituted a taking by setting forth the factors listed in Graham v. Estuary Properties, Inc., 399 So.2d 1374 (Fla.), cert. denied, 454 U.S. 1083, 102 S.Ct. 640, 70 L.Ed.2d 618 (1981). In Graham, this Court stated that the following were some of the factors which have been considered in determining

[w]hether a regulation is a valid exercise of the police power or a taking... .:
1. Whether there is a physical invasion of the property.
2. The degree to which there is a diminution in value of the property. Or stated another way, whether the regulation precludes all economically reasonable use of the property.
3. Whether the regulation confers a public benefit or prevents a public harm.
4. Whether the regulation promotes the health, safety, welfare, or morals of the public.
5. Whether the regulation is arbitrarily and capriciously applied.
6. The extent to which the regulation curtails investment-backed expectations.
Id. at 1380-81. The trial court noted that both parties agreed that factors 1, 2, and 6 were present. The trial court then began its analysis utilizing factor 5, whether the regulation was arbitrarily and capriciously applied.
Unlike the present case, Graham involved an appeal after exhaustion of administrative remedies. It was therefore permissible for Estuary Properties, Inc. to challenge the propriety of the agency action, which it did, in addition to alleging that the action, if upheld, constituted a taking which required the payment of just compensation. Because the propriety of the agency action was properly being challenged in Graham, factor 5 was a relevant consideration in that case. We conclude that factor 5 is not, however, a relevant consideration in a case such as the instant one, where the propriety of the agency action is presumed and the only issue is whether this action constituted a taking. This does not render the trial court's final judgment void or invalid. Although the trial court stated that it was considering first whether the action was arbitrary and capricious, the analysis set forth in the final judgment indicates that the trial court, in actuality, correctly considered whether Polk's nursery constituted a nuisance or imminent public disease. If the court had found Polk's nursery to be a nuisance or imminent public danger, no taking would have occurred and no compensation would be required. See infra note 4.
[3] The Department also argued that the trial judge improperly based his determination on irrelevant evidence of scientific knowledge developed subsequent to the destruction at issue. We reject this argument. The trial judge expressly stated in his order of final judgment that "this Court makes its determination considering all of the pertinent scientific evidence reasonably available to the State at the time of its Emergency Action Notification." (Emphasis added.) The Department concedes in its brief that "[t]he question of liability is whether the actions taken were appropriate in light of scientific evidence available at the time." (Emphasis added.)
[4] Polk argues that the trial court determined that all of the stock in the nursery, except for six trees which actually exhibited physical signs of the bacterial disease, were healthy and that compensation is therefore required for all of the nursery stock except for six trees, pursuant to this Court's decision in Department of Agriculture & Consumer Services v. Mid-Florida Growers, Inc., 521 So.2d 101 (Fla.), cert. denied, 488 U.S. 870, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988). Polk also argues that the trial court, in excluding the nursery stock within a 125-foot zone around the six trees with physical symptoms from the jury's consideration, invaded the exclusive province of the jury pursuant to section 73.071, Florida Statutes (1985), to determine the value of property taken. We reject these arguments. An examination of the trial court's final order on liability reveals that the trial court found that Florida nursery strain, the disease present in Polk's nursery, did not present a nuisance or an imminent danger and therefore destruction constituted a taking. The court did not determine that the destroyed trees were healthy. We agree that the trial court's statement that "the trees actually diseased, and those trees within one-hundred and twenty-five feet (125 ft) of them, had no marketable value" could give rise to the impression that the trial court encroached upon the exclusive province of the jury by determining the amount of compensation due for property taken. We conclude, however, that although not clearly articulated, the trial court's statement that the trees within 125 feet of those actually exhibiting symptoms of the bacterial disease had no market value was actually a determination that the destruction of those trees did not constitute a taking. As this Court recognized in State Plant Board v. Smith, 110 So.2d 401, 406-07 (Fla. 1959):

When, in the exercise of the police power, the State through its agents destroys diseased cattle, unwholesome meats, decayed fruit or fish, infected clothing, obscene books or pictures, or buildings in the path of a conflagration, it is clear that the constitutional requirement of "just compensation" does not compel the State to reimburse the owner whose property is destroyed. Such property is incapable of any lawful use, it is of no value, and it is a source of public danger.
(Emphasis added.)
[5] Although Lee County v. T & H Associates, 395 So.2d 557 (Fla. 2d DCA 1981), involved a taking of the land upon which the growing crop was located, this valuation method is equally applicable in a situation such as the present where only the crop is taken.
[6] We reiterate, however, that the Department should have been permitted to introduce evidence supporting its theory that the general market price for mature budded plants should not be applied to Polk because of knowledge of the presence of a bacterial disease.
[7] The Department also contends that consideration of any future values of liners was improper because the evidence presented at trial established that there was a market for liners at the time of the destruction of Polk's nursery stock. This asserted evidence was the testimony of Richard Polk that he purchased liners for 15 cents each. The record reveals, however, that Mr. Polk later clarified his prior statement by indicating that he purchased seedlings for 15 cents each and that there was no market for liners. The jury was properly left free to determine this issue.
[8] I would think that the market knowledge of the effects of the canker at the time of the taking only may be considered, not later-obtained facts which indicated the canker was a less virulent species.
[9] At trial Dr. Civerolo testified that, based on the scientific knowledge and results of research testing available at the time of the destruction of Polk's trees, the eradication procedures then being followed were proper and that it seemed more prudent to destroy the trees than to take some other action. Dr. Gabriel testified that, based on his research and studies, and knowledge available at that time, he considered the department's eradication procedures to be proper. Dr. Stall testified that, under the technology available at the time, he thought the department did about all that could have been done. Finally, Dr. Whiteside testified that in a November 1985 article he stated that, based on his studies of citrus groves in Argentina, Asian canker did not appear to be as severe a threat as he first thought and that the department's efforts to eradicate the recent outbreaks of a bacterial disease in Florida citrus nurseries that had been classified as canker seemed logical.
[10] This allowed nursery stocks greater than 125 feet from infested stock to remain undisturbed, but called for a one-year quarantine.
[11] For a fine analysis of the scientific aspects of the Florida citrus canker epidemic from a judicial perspective, I recommend Orange County Circuit Court Judge Joseph P. Baker's case history which he prepared in the case of Pokey's Citrus Nurseries v. Doyle Conner, no. CI 88-4138, a case turning on the same issues as the case on hand.
[12] Ch. 89-91, Laws of Fla.
[13] Throughout the proceeding the trial judge seemed to have been obsessed with the idea that the state should have known that the bacterium was less virulent and called for less severe methods of control. He seemingly predicated his conclusions of liability on this premise. If that is indeed the predicate, then the state is correct in contending that this was a negligence claim.
[14] As one commentator has recognized:

The modern, prevailing view is that any substantial interference with private property which destroys or lessens its value (or by which the owner's right to its use or enjoyment is in any substantial degree abridged or destroyed) is, in fact and in law, a "taking" in the constitutional sense, to the extent of the damages suffered, even though the title and possession of the owner remains undisturbed.
2 Nichols' The Law of Eminent Domain § 6.09, at 6-55 (rev. 3d ed. Dec. 1983) (emphasis supplied).
[15] For instance, in Department of Agriculture & Consumer Services v. Mid-Florida Growers, Inc., 521 So.2d 101 (Fla.), cert. denied, 488 U.S. 870, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988), the majority ordered compensation because the state action "conferred a public benefit." Id. at 103 (Ehrlich, J., writing for the majority). The dissent saw the identical action as the prevention of a public harm. Id. at 105 (McDonald, C.J., dissenting).